Carl Henry BLUE, Appellant,

v.

The STATE of Texas.

No. 72106.

Court of Criminal Appeals of Texas.

Oct. 22, 2003.

Rehearing Denied Jan. 28, 2004.

William F. Carter, Bryan, for Appellant.

Douglas Howell, III, Asst. DA, Bryan, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which KELLER, PJ., PRICE, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

A jury convicted appellant of capital murder and sentenced him to death. This Court affirmed appellant's conviction and sentence on direct appeal[1] and later denied state habeas corpus relief.[2] The United States District Court for the Southern District of Texas, however, ordered the State of Texas to conduct another punishment hearing.[3] The State of Texas conducted another punishment hearing before another jury, and the trial court sentenced appellant to death pursuant to the jury's answers to the special issues submitted at this punishment hearing. Appellant raises 39 points of error in an automatic direct appeal to this Court. We affirm.

In point of error one, appellant claims, as he did on direct appeal after his first trial, that the evidence is legally insufficient to support the jury's affirmative finding on the "future dangerousness" special issue. This claim requires the Court to view the evidence in the light most favorable to the jury's finding and then determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Allridge v. State, 850 S.W.2d 471, 487 (Tex.Cr.App.1991), cert. denied, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

The evidence from the new punishment hearing showed that, pursuant to a premeditated plan, appellant burst into his former girlfriend's apartment, threw gasoline on her and set her on fire. She died nineteen days later from the extensive burns that she suffered. The evidence

---

1. Blue v. State, No. 72,106 (Tex.Cr.App. December 4, 1996) (nonpublished) ("Blue I").

2. Ex parte Blue, No. 39,705–01 (Tex.Cr.App. January 13, 1999) (nonpublished).

3. This order apparently was based on a claim presented for the first time on federal habeas corpus and supported by the Texas Attorney General's confession that it was error for the trial court to have admitted evidence from appellant's own psychiatric witness.

also showed that appellant has a history of violence, especially toward current and former girlfriends.[4]

Appellant presented some good character evidence and evidence that he had a drug and alcohol problem at the time of the offense. Appellant also presented evidence from various prison employees that he had no record of violence during the seven years he was incarcerated on death row after his first trial. The prosecution responded to this through cross-examination with, among other things, evidence that appellant's nonviolent behavior on death row could have been due to the fact that death row inmates are limited in their movements and spend most of the time locked in their cells.

The prosecution presented evidence that appellant was a disciplinary problem while he was incarcerated in the county jail for the new punishment hearing. This evidence showed that appellant was "pounding and screaming" at county jail personnel after he refused their instructions to come out of his cell to get ready for court.

Q. This is [appellant]?

A. [Appellant] refused to come out of the tank. I asked him what was going on. He said it was too early for him to be dressed-out, that he did not need to be in court until 9:00 o'clock, and that he needed his rest and it was a bunch of bull to get him dressed-out that early and to put him in one of the holding cells up front.

Q. And what did you say in response?

A. I went through, telling him that he knew that we had to get him dressed-out early enough so he would not be late for court, that he would be on time for court, and that we had other people and other things to do, and he had to be the priority. That morning we had to have him ready for court at 8:30.

Q. And what was his response to that?

A. He still refused to come out of the tank; stating over and over that it was too early, that he refused; and that he wasn't coming out and that he did not want to sit in that holding cell for that long a period of time.

Q. How long did you talk to him and try to explain to him that he was coming out?

A. Between five and seven minutes.

Q. And the other officers had already been there for about 15 minutes; is that correct?

A. That's correct.

Q. What did he say, and what was his response to you when you said that he had to come out of the cell?

A. Well, when I got there, he was mad. And then he got angry, and then he started pounding his fists into the palms of his hand and started screaming at me and refusing to come out of the tank.

---

4. The record reflects that the prosecution presented at the new punishment hearing much of the same evidence that it presented at appellant's first trial. *See Blue I*, slip op. at 1–3, 5–7. We note, however, that the prosecution did not present at the new punishment hearing "testimony from a Bryan police officer that appellant was not a peaceful and law-abiding citizen" even though this evidence was presented at appellant's first trial. *See Blue I*, slip op. at 7. We also note that the prosecution did present at the new punish-ment hearing evidence of appellant's two prior misdemeanor convictions for evading and resisting arrest, even though it does not appear that the prosecution presented this evidence at appellant's first trial. *See Blue I*, slip op. at 6 (stating that the prosecution presented no evidence of prior convictions). Except as otherwise stated in this opinion, these appear to be the two arguably significant differences between the evidence presented at the new punishment hearing and the evidence presented at appellant's first trial.

Q. Can you demonstrate in front the [sic] jury when you say "pounding the palm of his hand?"

A. He had one hand like this and he was doing like this. And as he was doing that, he was screaming. (Indicating).

Q. And who was he directing that to?

A. To me.

Q. And in response to that, what did you do?

A. I told him he was coming out, and he said he was not. And I told him, fine, I would go call the [Detention Response Team] and he would come out.

Q. Before you told him you were going to call the DRT team—and we'll get into that—did you try and get that control door between the tank and the vestibule?

A. Yes, ma'am, but the noise was so loud that the control room person could not hear me telling him to shut the inside door, which is the sliding door that separates him from the vestibule into the tank.

Q. Why was the noise loud?

A. Because [appellant] was pounding and screaming at me.

Appellant's psychiatric expert expressed an opinion that there was no more than a 48 percent statistical probability that appellant would commit future acts of violence. This expert also testified that appellant's violence is "relationship driven" with "most of his major stuff" due to "some problem with women."

Q. All right. And would it be a fair statement to say, Doctor, that the actions of [appellant] are relationship driven?

A. They certainly do appear to be. I mean, everything that—most of his major stuff has come out of some problem with women.

Q. All right, Doctor. You're familiar with Special Issue 1—

A. Yes, sir.

Q. —are you not?

A. Yes, sir.

Q. That as written, "There's a probability [appellant] will commit future acts of violence that will constitute a continuing threat to society."

And I want to define for you, first, Doctor, as a probability being more likely than not. Okay?

A. All right.

Q. And with that particular definition of probability, do you have an opinion whether it is more likely than not, or probable, that [appellant] will commit future acts of violence that will constitute a continuing threat to society?

A. I do have an opinion.

Q. What is that opinion, Doctor?

A. Well, the data I have already cited, Mr. [appellant's lawyer], indicates that the statistical probability does not exceed that. In fact, worst case, it's 48 percent.

Q. All right. And, Doctor, when—you base your opinion statistically, and on what else?

A. Well, I think in terms of actually making that number judgment that you just put forth, I think our best guidance is from the actuarial.

Q. All right.

A. Certainly our feeling that there is— that [appellant] represents an elevated risk against the general population is well-supported in both the clinical analysis, and in looking at the pattern analysis of the things that he has done wrong.

On cross-examination, appellant's psychiatric expert testified that a free appellant would be "at an increased position for something bad." This expert also recog-

nized that the "future dangerousness" special issue makes no distinction between "prison and real life."

Q. And as long as he's free, he's a danger?

A. If he's free, then we're at an increased position for something bad.

Q. I mean—I guess my question to you—I mean, would you regard [appellant] as dangerous?

A. You have to tell me what you mean by "dangerous" to answer your question.

Q. I think that's a fairly common accepted—

A. If you assume what [appellant's lawyer] says, yeah, probably so.

Q. Okay.

A. If—but we do not have any way to factor in the effects of aging and whatever effect this experience has had on him.

Q. You understand—

A. But, in the world, I would be a lot more worried about [appellant].

Q. Okay. You know that the question Special Issue No. 1 you've been testifying in these kinds of cases for a long time, about this question—also applies to prison?

A. Yes, sir, I do.

Q. In fact, you know that it doesn't make a distinction between prison and real life? The question asks this jury to determine, as he sits there, is he a future danger; right?

A. Generally, it's taken that way. And I believe that is an appropriate question.

During closing jury arguments, appellant claimed that he would not be dangerous in prison if he received a life sentence which meant that he would not be eligible for parole until he had served 40 years.[5] The prosecution responded that appellant is dangerous and that a life-sentenced appellant would be dangerous in prison.

We decide, as we did before, that the facts of the offense and the other evidence of appellant's prior history of violence are sufficient to support the jury's affirmative finding on the "future dangerousness" special issue. *See Blue I*, slip op. at 6–7. Point of error one is overruled.

In point of error two, appellant claims that the evidence is factually insufficient to support the jury's affirmative finding on the "future dangerousness" special issue. We do not review a jury's finding on this issue for factual sufficiency. *See McGinn v. State*, 961 S.W.2d 161, 166–169 (Tex.Cr. App.), cert. denied, 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). Point of error two is overruled.

■■■ In point of error four, appellant claims that the trial court erroneously granted the prosecution's challenge for cause to veniremember Mata based on her personal beliefs against capital punishment in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A veniremember who can set aside her beliefs against capital punishment and honestly answer the special issues is not challengeable for cause. *See Witherspoon*, 88 S.Ct. at 1777; *Colburn v. State*, 966 S.W.2d 511, 517 (Tex.Cr.App.1998). A veniremember is challengeable for cause if her beliefs against capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and the juror's oath. *See Colburn*, 966 S.W.2d at 517.

---

**5.** *See Smith v. State*, 898 S.W.2d 838, 857–72 (Tex.Cr.App.), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995) (explaining how minimum parole eligibility could be considered relevant mitigating evidence).

We review a trial court's ruling on a challenge for cause with "considerable deference" because the trial court is in the best position to evaluate the venire-member's demeanor and responses. *See id.; Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Cr.App.1997) (appellate courts afford "almost total deference" to trial court's resolution of issues that turn on an evaluation of credibility and demeanor). We will reverse a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *See Colburn,* 966 S.W.2d at 517.

The record reflects that Mata's answers to various questions on her juror questionnaire form indicated that she had strong personal beliefs against capital punishment and that she could not impose the death penalty because of these personal beliefs. During voir dire, Mata testified that these personal beliefs had not changed even after an explanation of the capital sentencing process whereby "technically speaking, it's not the jury that sentences the defendant to death, it's the law based on the questions and the answers received by the jury."

The record further reflects that, during questioning by the prosecution, Mata provided conflicting answers on whether her personal beliefs would substantially interfere with her ability to serve as a juror. For example,

Q. Now, as I'm talking to you, if it's possible for you to do this—because, obviously, I'm representing the State of Texas. And, to be frank with you, I really would like to know that I have a jury of twelve people who, even though they may have reservations about the death penalty, or even though they may feel strongly about it, they could put all that aside and still give the State a fair shot.

The defense, obviously, wants to be sure of the same thing. So, to be very blunt with you, because of your answers on this thing, I don't think—it seems pretty clear to me that the State just doesn't have a shot with you in this case because of your strong feelings against the death penalty.

Is that a fair statement?

A. Yes, that would be a fair statement.

Q. Obviously, the defense would love to have you on this jury, because as you sit there, you probably have already decided—or you have, based on what I see in your questionnaire—that regardless of the evidence you hear in this case, you're going to answer these questions in such a way that the defendant receives a life sentence; is that a fair statement?

A. No, I don't think that would be a true statement.

Q. Why don't you explain to me?

A. I think if I had to serve on the jury, as hard as it would be, I would have to put my personal feelings out of it totally. I would have to go on the evidence and the statements presented to me.

My concern would be, would I be able to live with that decision, based on whatever it is, afterwards.

Q. Okay. Well, let me talk to you about some of the responses you gave in the questionnaire, because of what you just said—some of the questions, responses you gave in your questionnaire seem a little different to me.

A. Well, I guess, my main thing is, I don't feel like I'm an individual that could serve on the jury in this particular case.

Q. Now, why is that?

A. Because of my beliefs. I don't believe I have the right, even though the

law says I do, I don't believe I have the right—to see someone put to death.

Q. So you disagree with the law?

A. Not totally. I think that is an individual choice.

Q. Okay.

A. I mean, some people do agree with it. I'm not against it. I mean, I don't know if I, personally, can justify it in my heart or mind.

Q. Okay. I presume that your feelings about the death penalty, are they rooted in your religious beliefs?

A. To a certain point, yes.

Q. In your questionnaire, we gave you a scale of (1) to (10).(10) being a person who believes that the death penalty should be assessed in nearly every case, when a person has been convicted of capital murder, and (1) being a person who believes that the death penalty should almost never be assessed for a person convicted of capital murder. "Circle the number that you believe best describes where you would fit on that scale," and we have (10) through (1). So far, and we talked to 50 or 60 people, you are the only person who has put a zero and then circled that. Why did you do that?

A. Because, there again, my personal belief is, I don't believe I can do that.

Q. And putting down a(1) would have allowed—I mean, it says, I guess (1) being a person who believes that the death penalty should almost never be assessed of a person convicted of capital murder. You didn't choose that one.

A. I don't believe I could do that.

Appellant asked Mata no questions regarding her personal beliefs about capital punishment. The trial court then questioned Mata during which Mata testified that she did not know if she could "assess [the death penalty]."

Q. So, I mean, this is the only time that you'll ever be on a witness stand in this case; in other words, where people are asking you directly, "What is your answer going to be?"

Look on the top of the same page, and you circled, as far as attitudes go, with reference to the death penalty, "Which of the following best [sic] represent your feelings?" You circled Number 4: "I could never under any circumstances return a verdict which assessed the death penalty."

A. I guess my answer to that one was, I was looking at all of them. With Number 1 it, says, "I believe any person convicted should be given the death penalty." I don't agree with that.

"I believe that the death penalty is appropriate in some cases." Without knowing individual cases, I could not answer that one.

"Although I do not believe the death penalty ought to be revoked, as long as it provides it, I could assess it."

I don't—I personally, I'm totally against the death penalty, I don't know if I could assess it.

Q. Okay.

Mata ultimately stated in response to questioning by the trial court that her personal beliefs about capital punishment would not substantially impair her ability to serve on the jury.

Q. Okay. Well, do you believe that what you—do you believe that your feelings and your attitudes and your beliefs for the death penalty, and specifically about your personal involvement, do you think that would substantially impair your ability to serve on a jury where the State is seeking the death penalty?

A. As my duty as a citizen of the state, Brazos County, I would have to put those aside.

Q. Well, ma'am, I understand. I understand what you're saying.

A. It would be hard. Let's put it that way.

Q. Nobody—I have never come across—well, I don't think—I have yet to come across a person who has said, "You know, I would just simply disobey the judge's instructions and the Court's Charge, and I wouldn't follow the law." It's rare that a person would ever do that.

And so, I understand what you're saying. You seem to have a sense of duty in that regard.

A. Yes.

Q. And you've served on a jury before.

A. Yes.

Q. Now, I'm just asking you about your attitudes and your feelings and your beliefs. Only you know your heart, okay?

I mean, the law tells you, you have to set those things aside. But sometimes people can't, or at least they can't to the point where it would not impair their ability to serve.

So, having gone through that explanation, do you think that your beliefs or your attitudes would substantially impair your ability to serve?

A. No.

In granting the prosecution's challenge for cause to Mata, the trial court stated that it did not believe Mata when she testified that "I can follow my oath."

I'm satisfied to the extent that she's answering these questions in such a way where "Sure, I can follow my oath." I think she's simply saying what she thinks the Court or the attorney want to hear, and I don't believe her, so the challenge will be granted.

On this record, we cannot conclude that the trial court clearly abused its discretion to grant the prosecution's challenge for cause to Mata based on her conflicting answers about her ability to follow the law. *See Colburn,* 966 S.W.2d at 517 (appellate court should not second-guess trial court's ruling on challenge for cause where veniremember is "persistently uncertain" about her ability to follow the law and where her responses are "vacillating, unclear, or contradictory"). The trial court was in the best position to evaluate Mata's demeanor and responses. *See id.* Point of error four is overruled.

■ In point of error five, appellant claims that the trial court violated *ex post facto* provisions of the state and federal constitutions "when it denied [appellant's] motion to include the *Geesa* reasonable doubt [definition] in the court's charge on punishment."[6] The jury charge at appellant's first trial contained the *Geesa* definition of "reasonable doubt." The jury charge at appellant's new punishment hearing did not contain this definition because, at the time of appellant's new punishment hearing, this Court had overruled *Geesa* in *Paulson.*

Appellant claims that the trial court should have included the *Geesa* definition of "reasonable doubt" in the jury charge at the new punishment hearing because "*Geesa* was the law at the time of the offense and at the time of his first trial." We understand appellant to argue that the failure to include this definition in the jury charge violated the fourth definition of an *ex post facto* law by altering the legal rules of evidence and requiring less evidence to

---

**6.** *See Geesa v. State,* 820 S.W.2d 154, 162 (Tex.Cr.App.1991), *overruled, Paulson v. State,* 28 S.W.3d 570, 573 (Tex.Cr.App.2000).

sustain the jury's answer on the "future dangerousness" special issue than the law required at the time of the commission of the offense. *See Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 1697, 149 L.Ed.2d 697 (2001) (setting out the four generally recognized definitions of an *ex post* facto law with the fourth definition being a law that alters the legal rules of evidence and requires less evidence to convict than the law required when the offense was committed); *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 1627–36, 146 L.Ed.2d 577 (2000) (discussing and applying the fourth definition of an *ex post facto* law).

■ We disagree. The *ex post facto* clause of the federal constitution does not apply to judicial acts such as our decision in *Paulson. See Rogers,* 121 S.Ct. at 1697 (*ex post facto* clause of federal constitution is a limitation on legislative power and does not apply to "the Judicial Branch of government"). Even if it did, we do not see how the failure to include the *Geesa* definition of "reasonable doubt" in the jury charge altered the legal rules of evidence and required less evidence to sustain the jury's verdict on the "future dangerousness" special issue than the law required at the time of the commission of the offense.

Appellant nevertheless claims in points of error six through eight that the failure to include the *Geesa* definition of "reasonable doubt" in the jury charge violated various other state and federal constitutional provisions that recognize some limitations on *ex post facto* judicial decision-making. *See, e.g., Rogers,* 121 S.Ct. at 1697–1703 (recognizing that "limitations on *ex post facto* judicial decision-making are inherent in the notion of due process").

Appellant's arguments under these points are somewhat vague, but he seems to claim that the failure to include the *Geesa* "reasonable doubt" definition in the jury charge was fundamentally unfair because "it was given at his first trial and was the law at that time and at the time of the offense."

This case, however, does not implicate the *ex post facto* limitations on judicial decision-making discussed in cases such as *Rogers.* That case discussed "unforeseeable and retroactive judicial expansion of statutory language" that infringed the right to fair warning that certain conduct would give rise to criminal penalties. *See Rogers,* 121 S.Ct. at 1698–1700. Our decision in *Paulson* abrogating the *Geesa* definition of "reasonable doubt" could not have deprived appellant of fair warning that his conduct of dousing someone with gasoline and then lighting her on fire could give rise to criminal penalties. *See id.* In addition, we do not see how the failure to give the ":redundant, confusing, and logically-flawed" *Geesa* definition of "reasonable doubt" could have possibly harmed appellant. *See Paulson,* 28 S.W.3d at 573. Points of error five through eight are overruled.

■ In point of error twenty, appellant claims that Article 37.071 violates various federal constitutional provisions because it does not require the prosecution "to prove beyond a reasonable doubt that the answer to [the mitigating evidence special issue] should be 'no.' " Appellant claims that the Supreme Court's recent decision in *Ring v. Arizona*[7] calls into question our settled case law rejecting the claim made in point

---

7. *See Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002) (federal constitutional right to jury trial is violated by allowing "a sentencing judge, sitting without a jury, to find an aggravating circumstance" that increases the authorized punishment for a crime).

of error twenty.[8] In point of error thirty-four, appellant claims that Article 37.071 violates various federal constitutional provisions and *Ring* "because it place[d] the burden of proof on the mitigation issue on [appellant]."

We resolved both of these claims adversely to appellant in a nonpublished decision in *Basso v. State,* No. 73,672, slip op. at 36–37, 2003 WL 1702283 (Tex.Cr.App. January 15, 2003), in which we stated:

We have held that neither party bears the burden of proof at punishment on the mitigating evidence special issue. (Citations Omitted). The holding in [*Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)] does not affect our prior decisions or our determination of the appellant's point. Where a finding of a fact (other than a prior conviction) *increases the authorized punishment* for a crime, the State must prove and a jury must find that fact beyond a reasonable doubt. *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 2439, 153 L.Ed.2d 556 (2002); [*Apprendi*], 530 U.S. at 476, 120 S.Ct 2348 (emphasis added). Under Article 37.071, there is no authorized increase in punishment contingent on the jury's finding on the mitigating special issue. *See Ring,* 122 S.Ct. at 2439. A jury will answer the mitigation special issue only "if [it] returns an affirmative finding to each issue submitted under [the 'future dangerousness' special issue]." (Citation Omitted). In other words, a jury's finding on mitigation occurs only after the State has proven the elements of capital murder, at the guilt stage, and the aggravating circumstances—evidence of the defendant's future dangerousness—beyond a reasonable doubt. (Citation Omitted). By the time the jury reaches the mitigation issue, the State has already demonstrated the defendant's eligibility for a death sentence; a negative answer on mitigation cannot increase his authorized punishment. The statute mandates only a reduction in punishment to a life sentence upon an affirmative finding of mitigation. (Citation Omitted). Therefore, [*Apprendi* ] is not applicable to the appellant's point of error. The trial court did not err in not assigning the burden on the mitigation issue to the State.

We adopt this discussion and reasoning here. *See also Resendiz v. State,* 112 S.W.3d 541, 549–50 (Tex.Cr.App.2003); *Allen v. State,* 108 S.W.3d 281, 285 (Tex.Cr.App.2003). Points of error twenty and thirty-four are overruled.

■ In point of error seventeen, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury to consider any evidence of the circumstances of the offense that "tend to show that [appellant] did not kill the deceased in the course of a burglary or attempted burglary." In point of error eighteen, appellant makes the same claim with respect to the trial court's failing to instruct the jury that a conviction for capital murder did not "preclude the jury from considering evidence of circumstances of the offense that tend to show another cause contributing to the death of the deceased, or tend to show that [appellant] did not commit the crime alleged." (Internal quotes omitted). In point of error nineteen, appellant makes the same claim with respect to the trial court's jury instruction that "appellant was guilty of intentionally causing the death of [the deceased] while in the course of committing the offense of burglary of a habitation and

---

8. *See Jackson v. State,* 992 S.W.2d 469, 480–81 (Tex.Cr.App.1999) (rejecting claim that mitigating evidence special issue is unconstitutional because it omits a burden of proof).

knowingly entering into the habitation without the effective consent of [the deceased]." In point of error twenty-nine, appellant claims that the trial court violated various federal constitutional provisions and the Supreme Court's decision in *Ring* "by failing to instruct the jury that they must consider any evidence of the circumstances of the offense that tend to show that the appellant did not kill the deceased in the course of burglary or attempted burglary or there were other contributing causes to the death of the victim."

The record reflects that the jury at appellant's first trial convicted appellant of murdering the victim during a burglary.[9] The trial court instructed the jury at the new punishment hearing that appellant was guilty of capital murder, specifically of murdering the victim "in the course of committing the offense of Burglary of a Habitation by intentionally or knowingly entering the habitation without the [victim's] effective consent." Appellant claims:

> What were the jurors to do? The judge specifically instructed them that the appellant was guilty of capital murder and generally instructed them to consider the "circumstances of the offense." How was the jury to consider the circumstances of the offense when considering the court's specific instruction that the appellant was guilty of capital murder? If a juror had a doubt about whether the appellant committed a burglary, i.e., entered without the effective consent of the victim, would that juror

be allowed to express that doubt in answering the special issues? The juror would ·be in an "impossible situation" because the court's charge instructed that the appellant was guilty of capital murder. Thus there was an internal contradiction in the charge between the specific and general instruction. Which instruction was the jury to follow?

We understand appellant to argue that the trial court's failure to submit appellant's requested instructions, coupled with the instructions actually submitted by the trial court, prevented the jury from being able to give mitigating effect to any "residual doubt" about whether appellant was guilty of burglary. A majority of the Supreme Court, however, rejected such a claim in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). *See Franklin,* 108 S.Ct. at 2327 (White, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ.) (federal constitution does not require reconsideration by capital sentencing juries of "residual doubts" about a defendant's guilt because such doubts do not involve a defendant's character, record or a circumstance of the offense) [10] and at 2335 (O'Connor, J., joined by Blackmun, J.) ("residual doubt" about the defendant's guilt is not a mitigating circumstance).

We further note that appellant makes no claim that he was prevented from presenting any mitigating evidence. We also note that appellant had the opportunity to argue his "residual doubt" claim to the jury

---

**9.** On direct appeal from appellant's first trial, we rejected appellant's claim that the evidence was legally insufficient to support a finding that he did not have the victim's consent to enter her apartment. *See Blue I,* slip op. at 3–4.

**10.** The lead plurality opinion in *Franklin,* 108 S.Ct. at 2327 fn. 6, further stated:

> Finding a constitutional right to rely on a guilt-phase jury's "residual doubts" about innocence when the defense presents its mitigating case in the penalty phase is arguably inconsistent with the common practice of allowing penalty-only trials on remand of cases where a death sentence—but not the underlying conviction—is struck down on appeal. (Citations omitted).

which could have given mitigating effect to any "residual doubt" in answering the special issues. *See Franklin,* 108 S.Ct. at 2327–28 (even if a constitutional right exists to have "residual doubt" considered as a mitigating factor, the trial court did not impair the defendant's exercise of that right and the special issues did not preclude the jury from giving mitigating effect to any "residual doubt").

> [APPELLANT]: Now, there's another thing that is kind of important. I think it is. I think a person that would, you know, violate somebody's home and then come in and do something to them on the inside has got to be considered more dangerous than somebody else. And I think that's part of the State's case here. They want you to believe that [appellant]—he got into that apartment that morning without consent and without thinking he had consent—
>
> [THE PROSECUTION]: Your Honor, we object. The State doesn't want to believe him. That is law. This [appellant] is guilty of capital murder by burglary into that apartment, as it is defined in Texas law. And we object.
>
> [APPELLANT]: The evidence is in. I'm just arguing the evidence, and—
>
> [THE PROSECUTION]: He's technically arguing outside the record. The facts is, as a matter of law, [appellant] is guilty of capital murder by entering that apartment without the effective consent of [the victim].
>
> [APPELLANT]: But I'm arguing that his personal, moral blameworthiness is not as much as it might otherwise appear.
>
> [THE COURT]: The objection is overruled. However, the jury will recall the evidence and the testimony that was presented during the trial.
>
> [APPELLANT]: Okay. I would like for you to take into account the testimony of [a witness].
>
> I believe, from memory, that when the prosecutor stood up here in opening statement three days ago, she, I believe, led you to believe that the relationship between [appellant and the victim] had been over for four months.
>
> Then we asked [a witness] about [appellant and the victim]. She lived with [the victim] about two weeks, starting in late June, and these facts occurred in August. So, that's well within the four-month period of time, if you recall. I asked her, "Did [appellant] come to the apartment?"
>
> "Yes."
>
> "Did somebody—did you let him in?"
>
> "Yes."
>
> "Did [the victim] let him in?"
>
> "Yes."
>
> You see, I think it's entirely possible that the relationship with [appellant] wasn't over.

Thus, not only was appellant permitted to make the argument; he made the argument he wanted. Also, for the reasons set out in our discussion of points of error twenty and thirty-four, the trial court's failure to submit appellant's requested jury instructions did not violate the Supreme Court's decision in *Ring.* Finally, after making a common-sense evaluation of the record, particularly the overwhelming evidence that appellant did not have the victim's consent to enter her apartment, we cannot say that there is a reasonable likelihood that the trial court's failure to submit appellant's requested instructions, coupled with the instructions actually submitted by the trial court, prevented the jury from considering constitutionally relevant mitigating evidence. *See Ex parte Tennard,* 960 S.W.2d 57, 61–62 (Tex.Cr.

App.1997), cert. denied, 524 U.S. 956, 118 S.Ct. 2376, 141 L.Ed.2d 743 (1998). Points of error seventeen through nineteen and twenty-nine are overruled.

In points of error three, nine through sixteen, twenty-one through twenty-eight, thirty through thirty-three and thirty-five through thirty-nine, appellant raises various nonmeritorious claims. In point of error three, appellant claims that Article 37.071, TEX.CODE CRIM. PROC., violates various federal constitutional provisions "because it fails to provide a meaningful appellate review of the jury's answers to the special issues." In points of error nine and twenty-one, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "probability" in the "future dangerousness" special issue "meant a high probability, beginning at 95% and, if denied, then descending to a percentage no lower than 50%."

In points of error ten and twenty-two, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "criminal acts of violence" in the "future dangerousness" special issue mean "an act that resulted in serious bodily injury or death and not one that was trivial, accidental, reckless, or highly provoked acts." In points of error eleven and twenty-three, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "criminal acts of violence" in the "future dangerousness" special issue do "not mean mere property crimes not in conjunction or combination with crimes against the person." In points of error twelve and twenty-four, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "criminal acts of violence" in the "future dangerousness" special issue do "not mean mere property crimes not in conjunction or combination with crimes causing serious bodily injury or death."

In points of error thirteen and twenty-five, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "continuing threat to society" in the "future dangerousness" special issue means "a clear and present threat of serious bodily injury or death to others while in prison or free society." In points of error fourteen and twenty-six, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "continuing threat to society" in the "future dangerousness" special issue means "that [appellant] will be so incorrigible that his serious misconduct will continue after [appellant] becomes parole eligible."

In points of error fifteen and twenty-seven, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "society" in the "future dangerousness" special issue means "prison society for so long as [appellant] may be incarcerated." In points of error sixteen and twenty-eight, appellant claims that the trial court violated various federal constitutional provisions by failing to instruct the jury that "probability" in the "future dangerousness" special issue means "more likely than not."

In points of error thirty and thirty-one, appellant claims that Article 37.071 violates various federal constitutional provisions because its definition of mitigating evidence "narrows the jury's consideration of any evidence about [appellant's] character and background, the circumstances of the offense, and [appellant's] personal moral culpability to that which the jury might regard as reducing [appellant'] moral blameworthiness." In point of error

thirty-two, appellant claims that the "12/10 rule" in Article 37.071 violates various federal constitutional provisions. In point of error thirty-three, appellant claims that Article 37.071 violates various federal constitutional provisions because "it prohibits the Court, the attorney representing the State, [appellant], and [appellant's] counsel from informing the jurors or the prospective jurors of the effect of the failure of a jury to agree on the [special] issues submitted."

In point of error thirty-five, appellant claims that Article 37.071 violates various federal constitutional provisions because the term "probability" is "so vague that it fails to provide in the sentencing process heightened reliability and a reasoned moral response." In point of error thirty-six, appellant makes the same claim with respect to the phrase "criminal acts of violence." In point of error thirty-seven, appellant makes the same claim with respect to the phrase "continuing threat to society." In point of error thirty-eight, appellant makes the same claim with respect to the phrase "personal moral culpability." In point of error thirty-nine, appellant makes the same claim with respect to the phrase "moral blameworthiness."

We have decided these and similar claims adversely to appellant. *See Wright v. State,* 28 S.W.3d 526, 537 (Tex.Cr.App. 2000), cert. denied, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001); *Ladd v. State,* 3 S.W.3d 547, 572–73 (Tex.Cr.App. 1999), cert. denied, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *Raby v. State,* 970 S.W.2d 1, 8 (Tex.Cr.App.), cert. denied, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998); *Cockrell v. State,* 933 S.W.2d 73, 93 (Tex.Cr.App.1996), cert. denied, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). We, therefore, overrule points of error three, nine through sixteen, twenty-one through twenty-eight, thirty through thirty-three and thirty-five through thirty-nine.

We affirm the judgment of the trial court.

MEYERS, J., concurs in points 2, 5–8 and otherwise joins.

WOMACK, J., concurs.