IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






No. AP-75,603






TILON LASHON CARTER, Appellant



v.



THE STATE OF TEXAS








ON DIRECT APPEAL FROM CAUSE NO. 94-9973D


IN THE 371ST DISTRICT COURT


TARRANT COUNTY






 Holcomb, J., delivered the opinion of the Court, in which Meyers,
Price, Womack, Johnson, and Cochran, JJ., joined. Keller, P.J., and
Keasler and Hervey, JJ., concurred in the result. 



 Appellant was convicted in November 2006 of capital murder. Tex. Penal Code
Ann. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the Texas
Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), and a mental-retardation
special issue, the trial judge sentenced appellant to death. Art. 37.071, § 2(g). (1) Direct appeal
to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's ten points of
error, we find them to be without merit. Consequently, we affirm the trial court's judgment
and sentence of death.

STATEMENT OF FACTS

 Appellant was charged with intentionally causing the death of James Eldon Tomlin,
"by restraining him and causing him to lie face down and by smothering him by exerting
pressure on his head or face with an object unknown to the grand jury," during the course of
robbery. Appellant gave two statements to Detective Cheryl Johnson, who read them to the
jury. In appellant's first statement, he told police that he and his girlfriend, Leketha Allen,
had been talking about needing money when Leketha's mother suggested that they rob
Tomlin, an elderly man who lived alone and kept large amounts of cash in his house. 
Leketha's mother drove them to Mims Street and pointed out Tomlin's house. The next day,
appellant and Leketha drove back to Tomlin's house. Appellant waited in the car while
Leketha, who was acquainted with Tomlin, knocked on the back door. After Tomlin opened
the door, appellant walked up and told Leketha to get back in the car. Tomlin swung a
hammer at appellant, but he dodged it and ordered Tomlin to lie down. Tomlin complied. 
Appellant started looking around the house. Leketha then walked into the house, and they
both searched it. She told appellant that Tomlin was going to get up and move, so appellant
bound Tomlin's hands with duct tape. He used a sock to hold the tape, and he tore the tape
with his teeth. Leketha took two jars of coins from the kitchen, and appellant took an old,
long gun from the bedroom. Leketha went back to the car. Appellant "came out last," and
they drove back to Leketha's mother's house.

 In his second statement, appellant indicated that he had borrowed a gun in preparation
for the robbery and that he was holding it when he entered Tomlin's house. He stated that
after Tomlin swung the hammer at him, he grabbed Tomlin's arm and made him sit down on
the floor. When Leketha walked into the house, appellant gave her the gun to hold while he
bound Tomlin's hands and feet with duct tape. After they finished searching the house and
Leketha went back to the car, appellant watched Tomlin for a minute to make sure he was
all right. Tomlin was sitting up with his legs straight out in front of him. Appellant told
Tomlin they were leaving, and Tomlin said, "Okay."

 Tomlin's daughter and responding law-enforcement officers testified that Tomlin's
body was found lying face down on the floor just inside the back door, with his feet blocking
the doorway. His hands were bound behind his back by duct tape that was wound around his
wrists. Duct tape was also wound around his ankles. There was tape residue on his shirt and
socks that was consistent with him having moved his arms and legs after they had been
bound. His face was turned to the side. A piece of duct tape, partially folded over, was stuck
to the side of his mouth area. There were two bloody injuries on the top and the left side of
his head. Tomlin's glasses and a hammer with blood on the handle were found on the floor
near his body.

 A medical examiner testified that Tomlin's flesh at both his wrists and ankles had
been compressed and his skin had been damaged by duct tape. The lacerations on Tomlin's
face and head were the result of blunt-force trauma that might have caused a temporary loss
of consciousness but no significant injury to the skull or brain. The inside of Tomlin's upper
lip had been pressed hard against his teeth, resulting in a hemorrhaging injury. The nature
of this injury indicated that it was the result of applying profound and sustained pressure
against Tomlin's mouth for at least thirty seconds while he was still alive. The injury was
typical of smothering, and it would not have resulted from the impact of a fall or from the
weight of Tomlin's head as he lay on the floor.

 The medical examiner further testified that, given the position of Tomlin's body when
it was found and the evidence he had seen, Tomlin was bound while lying face down on the
floor, and it would have been impossible for him to sit up and talk to anybody. The medical
examiner acknowledged that most people probably would not understand the risk of death
involved in binding someone in that position. However, he emphasized that he could not
exclude smothering because the markings he had observed were "very consistent" with
smothering. He ruled that the cause of death was "smothering with positional asphyxia."

 Appellant's ex-girlfriend testified that appellant told her that he and Leketha had
killed an old white man during a robbery at a house on Mims Street. Appellant's former cell-mate testified that appellant had tried to intimidate him by boasting that he and his girlfriend
had killed an old man during a robbery.

DISJUNCTIVE LANGUAGE IN JURY INSTRUCTION

 In appellant's first point of error, he claims that the trial court erred in providing a jury
instruction at the guilt phase that permitted the jury to convict appellant of capital murder if
it determined that appellant intentionally caused Tomlin's death "by restraining him or
causing him to lie face down or by smothering him by exerting pressure on his head or face,"
in the course of committing or attempting to commit a robbery, when the indictment had
charged the acts of "restraining him" and "causing him to lie face down" in the conjunctive.

 Appellant acknowledges the general rule that the jury properly may be charged in the
disjunctive with multiple means of committing the offense when the indictment alleged them
in the conjunctive. See, e.g., Martinez v. State, 129 S.W.3d 101, 103 (Tex. Crim. App.
2004). He argues, however, that this case presents an exception to the rule because the acts
of restraining Tomlin and causing him to lie face down were necessary parts of a single
means of causing death by positional asphyxiation. Appellant urges that charging these acts
in the disjunctive improperly allowed a conviction if the jury found that appellant had just
restrained Tomlin, without requiring the jury to find that appellant had also caused Tomlin
to be in the prone position that caused his death from positional asphyxiation. He reasons
that the disjunctive language allowed conviction under a theory not contained in the
indictment.

 We are not persuaded that charging the acts in the disjunctive impermissibly allowed
conviction under a theory not contained in the indictment. See, e.g., Zanghetti v. State, 618
S.W.2d 383, 387 (Tex. Crim. App. 1981) (when indictment alleged appellant committed
murder by striking victim in the head with a glass bottle, a piece of wood, and by means
unknown, jury was properly instructed in the disjunctive); Medina v. State, 49 S.W. 380, 380-81 (Tex. Crim. App. 1899) (indictment charged that appellant caused victim's death by
beating, starving, and hanging with a rope; proof of any one cause would be sufficient, or,
"if all were proved, and together they co-operated to produce the death," that would also be
sufficient). Finally, even if we were to assume error, the record does not show egregious
harm. See Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

 Appellant also asserts that there was no evidence to support a theory that he caused
Tomlin's death by restraint alone. "It is settled that 'when a jury returns a guilty verdict on
an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence
is sufficient with respect to any of the acts charged.'" Kitchens v. State, 823 S.W.2d 256, 259
(Tex. Crim. App. 1991) (quoting Turner v. United States, 396 U.S. 398, 420 (1970)). 
Appellant does not complain that there was insufficient evidence that he intentionally caused
Tomlin's death by positional asphyxiation or smothering, and the record shows that the
evidence presented at trial was sufficient. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).

 The jury was charged that it could not find appellant guilty of capital murder unless
it found beyond a reasonable doubt that he had intentionally caused Tomlin's death. 
Charging the acts in the disjunctive was not error, much less egregious error. The evidence
was sufficient to support a finding of guilt under one or more of the means alleged, and the
jury properly returned a general verdict. Point of error one is overruled.

SPECIAL ISSUES NOT CHARGED IN INDICTMENT

 In point of error two, appellant claims that the trial court erred in overruling his
motions to preclude the death penalty as a sentencing option and declare Article 37.071
unconstitutional on the ground that Texas law allows for a death sentence without grand-jury
review of the special issues. He reasons that the special issues are "aggravated factors" that,
as elements of the offense, must be pleaded in the indictment and proven beyond a
reasonable doubt. He also asserts that the current statutory scheme violates due process
because it allows the State to bypass the grand jury and arbitrarily determine who is "death
worthy."

 We have rejected these arguments in previous cases. Joubert v. State, 235 S.W.3d
729, 731-32 (Tex. Crim. App. 2007), cert. denied, 128 S. Ct. 1446 (2008); Renteria v. State,
206 S.W.3d 689, 709 (Tex. Crim. App. 2006). We are not persuaded to reconsider them
here. Point of error two is overruled.

MOTION TO SUPPRESS APPELLANT'S STATEMENT

 In point of error three, appellant claims that the trial court erred in overruling his
motion to suppress the second written statement obtained by police because that statement
was given after the appointment of counsel, and the State did not meet its burden to show
appellant had voluntarily waived the presence of counsel. (2) He argues that, because he had
requested counsel at the arraignment, the State's showing that he later re-initiated
communication with Detective Johnson, and that Detective Johnson read him his Miranda
rights and obtained an acknowledgment and waiver, was insufficient to establish a voluntary
waiver of the right to counsel. (3)

 The grounds that appellant raised in his motions to suppress do not comport with his
ground of error on appeal. In his pre-trial motions to suppress, appellant asserted that his
statements to police were the products of an illegal arrest and/or an illegal search and seizure. 
The testimony and argument at the pre-trial hearing on these motions were addressed to the
claims raised in the motions and to the voluntariness of the statements. Counsel did not
argue that appellant's right to counsel had been violated. In closing, he objected that the
statements were not voluntary. The court found the statements were voluntary and denied
the motions to suppress.

 After his motions to suppress had been denied and during the voir dire of Detective
Johnson at trial, counsel objected for the first time that appellant's second statement was
inadmissible because he had invoked his right to counsel by signing a request for the
appointment of counsel at the arraignment. The prosecutor responded that appellant had re-initiated communication with Detective Johnson. (4) The trial court admitted the second
statement, finding that appellant had knowingly, intelligently, and voluntarily waived his
right to counsel and his right to remain silent.

 Even assuming arguendo that appellant preserved error, his claim fails on the merits. 
Appellant validly waived his right to counsel when he re-initiated communication with
Detective Johnson. See Cross v. State, 144 S.W.3d 521, 526-527 (Tex. Crim. App. 2004);
Fuller v. State, 829 S.W.2d 191, 205 (Tex. Crim. App. 1992). The trial court did not err in
admitting appellant's second statement. Point of error three is overruled.

10-12 RULE

 In points of error four and seven, appellant claims that the trial court erred in
overruling appellant's "federal constitution based objection to the so called '10-12' Rule,"
and he further claims the trial court erred in failing to instruct the jury that if a single juror
"holds out" for life, the appellant would receive a sentence of life imprisonment by operation
of law. He asserts that the 10-12 Rule violates the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution because it invades the province of the jury and
unduly pressures jurors to change their votes in order to reach a result. We have rejected
these arguments in previous cases. See, e.g., Druery v. State, 225 S.W.3d 491, 509 (Tex.
Crim. App. 2007), cert. denied, 128 S.Ct. 627 (2007); Prystash v. State, 3 S.W.3d 522, 536
(Tex. Crim. App. 1999). We are not persuaded to revisit them here. Points of error four and
seven are overruled.

MITIGATION SPECIAL ISSUE

 In point of error five, appellant claims that the trial court erred in overruling defense
counsel's objection to the submission of the mitigation special issue on grounds that it failed
to place the burden of proof on the State, in violation of the Fifth and Sixth Amendments to
the United States Constitution. He asserts that failing to instruct the jury that the State has
the burden of proof deprived him of the right to trial by jury and the right to have all elements
proven beyond a reasonable doubt. We have rejected this argument before. Ladd v. State,
3 S.W.3d 547, 573 (Tex. Crim. App. 1999). Point of error five is overruled.

 In point of error six, appellant claims that the trial court erred in overruling appellant's
objection to the failure of the mitigation instruction to require the jurors to find that the
aggravating circumstances outweighed the mitigating circumstances before returning a
verdict requiring the imposition of death. He asserts that the jury should have been instructed
that, if it had a reasonable doubt as to whether the aggravating factors outweighed the
mitigating factors, then it should have answered the mitigation special issue in the
affirmative. He acknowledges that we have rejected similar arguments in previous cases. 
See, e.g., Hankins v. State, 132 S.W.3d 380 (Tex. Crim. App. 2004); Blue v. State, 125
S.W.3d 491 (Tex. Crim. App. 2003). We are not persuaded to reconsider the issue here. 
Point of error six is overruled.

 In point of error ten, appellant claims that the mitigation special issue provided by
Article 37.071 is unconstitutionally vague and indefinite, in violation of appellant's rights
under the Fourteenth Amendment of the United States Constitution, and Article I, section 19,
of the Texas Constitution. He admits that we have rejected similar arguments before. See,
e.g., Feldman v. State, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); Ladd, 3 S.W.3d at 573. 
He invites the Court to revisit the issue because the record in this case "clearly rebuts" the
presumption that jurors understand the terms used in the special issues and "reflects the
public's confusion" on the question of what properly constitutes mitigating evidence in a
capital case. Appellant has not persuaded us to revisit this issue. Point of error ten is
overruled.

EXECUTION PROTOCOL

 In points of error eight and nine, appellant claims that the use of pancuronium bromide
in the lethal-injection protocol violates the Eighth Amendment of the United States
Constitution and Article I, section 13, of the Texas Constitution. He suggests that, because
Texas has specifically banned the use of pancuronium bromide in the euthanization of
animals on humanitarian grounds, the state constitutional protection may be greater than the
federal constitutional protection.

 Appellant's execution is not imminent; therefore, the method in which the lethal
injection is currently administered is not determinative of the way it will be administered at
the moment of appellant's execution. These claims are not ripe for review. See Gallo v.
State, 239 S.W.3d 757, 780 (Tex. Crim. App. 2007). Points of error eight and nine are
overruled.

 We affirm the judgment of the trial court.


DELIVERED JANUARY 14, 2009


DO NOT PUBLISH
1. Unless otherwise indicated, all references to Articles refer to the Code of Criminal
Procedure.
2. The record reflects that two motions to suppress were filed, but appellant refers to only
one motion.
3. Miranda v. Arizona, 384 U.S. 436 (1966).
4. Appellant did not argue before the trial court, and he does not argue now, that he did
not in fact re-initiate communication with Detective Johnson.