

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. AP-75,603

**TILON LASHON CARTER, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 94-9973D
### IN THE 371ST DISTRICT COURT
### TARRANT COUNTY

**HOLCOMB, J., delivered the opinion of the Court, in which MEYERS, PRICE, WOMACK, JOHNSON, and COCHRAN, JJ., joined. KELLER, P.J., and KEASLER and HERVEY, JJ., concurred in the result.**

Appellant was convicted in November 2006 of capital murder. TEX. PENAL CODE ANN. § 19.03(a)(2). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), and a mental-retardation

special issue, the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's ten points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant was charged with intentionally causing the death of James Eldon Tomlin, "by restraining him and causing him to lie face down and by smothering him by exerting pressure on his head or face with an object unknown to the grand jury," during the course of robbery. Appellant gave two statements to Detective Cheryl Johnson, who read them to the jury. In appellant's first statement, he told police that he and his girlfriend, Leketha Allen, had been talking about needing money when Leketha's mother suggested that they rob Tomlin, an elderly man who lived alone and kept large amounts of cash in his house. Leketha's mother drove them to Mims Street and pointed out Tomlin's house. The next day, appellant and Leketha drove back to Tomlin's house. Appellant waited in the car while Leketha, who was acquainted with Tomlin, knocked on the back door. After Tomlin opened the door, appellant walked up and told Leketha to get back in the car. Tomlin swung a hammer at appellant, but he dodged it and ordered Tomlin to lie down. Tomlin complied. Appellant started looking around the house. Leketha then walked into the house, and they both searched it. She told appellant that Tomlin was going to get up and move, so appellant

---

[1] Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

bound Tomlin's hands with duct tape. He used a sock to hold the tape, and he tore the tape with his teeth. Leketha took two jars of coins from the kitchen, and appellant took an old, long gun from the bedroom. Leketha went back to the car. Appellant "came out last," and they drove back to Leketha's mother's house.

In his second statement, appellant indicated that he had borrowed a gun in preparation for the robbery and that he was holding it when he entered Tomlin's house. He stated that after Tomlin swung the hammer at him, he grabbed Tomlin's arm and made him sit down on the floor. When Leketha walked into the house, appellant gave her the gun to hold while he bound Tomlin's hands and feet with duct tape. After they finished searching the house and Leketha went back to the car, appellant watched Tomlin for a minute to make sure he was all right. Tomlin was sitting up with his legs straight out in front of him. Appellant told Tomlin they were leaving, and Tomlin said, "Okay."

Tomlin's daughter and responding law-enforcement officers testified that Tomlin's body was found lying face down on the floor just inside the back door, with his feet blocking the doorway. His hands were bound behind his back by duct tape that was wound around his wrists. Duct tape was also wound around his ankles. There was tape residue on his shirt and socks that was consistent with him having moved his arms and legs after they had been bound. His face was turned to the side. A piece of duct tape, partially folded over, was stuck to the side of his mouth area. There were two bloody injuries on the top and the left side of his head. Tomlin's glasses and a hammer with blood on the handle were found on the floor

near his body.

A medical examiner testified that Tomlin's flesh at both his wrists and ankles had been compressed and his skin had been damaged by duct tape. The lacerations on Tomlin's face and head were the result of blunt-force trauma that might have caused a temporary loss of consciousness but no significant injury to the skull or brain. The inside of Tomlin's upper lip had been pressed hard against his teeth, resulting in a hemorrhaging injury. The nature of this injury indicated that it was the result of applying profound and sustained pressure against Tomlin's mouth for at least thirty seconds while he was still alive. The injury was typical of smothering, and it would not have resulted from the impact of a fall or from the weight of Tomlin's head as he lay on the floor.

The medical examiner further testified that, given the position of Tomlin's body when it was found and the evidence he had seen, Tomlin was bound while lying face down on the floor, and it would have been impossible for him to sit up and talk to anybody. The medical examiner acknowledged that most people probably would not understand the risk of death involved in binding someone in that position. However, he emphasized that he could not exclude smothering because the markings he had observed were "very consistent" with smothering. He ruled that the cause of death was "smothering with positional asphyxia."

Appellant's ex-girlfriend testified that appellant told her that he and Leketha had killed an old white man during a robbery at a house on Mims Street. Appellant's former cell-mate testified that appellant had tried to intimidate him by boasting that he and his girlfriend

had killed an old man during a robbery.

## DISJUNCTIVE LANGUAGE IN JURY INSTRUCTION

In appellant's first point of error, he claims that the trial court erred in providing a jury instruction at the guilt phase that permitted the jury to convict appellant of capital murder if it determined that appellant intentionally caused Tomlin's death "by restraining him or causing him to lie face down or by smothering him by exerting pressure on his head or face," in the course of committing or attempting to commit a robbery, when the indictment had charged the acts of "restraining him" and "causing him to lie face down" in the conjunctive.

Appellant acknowledges the general rule that the jury properly may be charged in the disjunctive with multiple means of committing the offense when the indictment alleged them in the conjunctive. *See, e.g., Martinez v. State,* 129 S.W.3d 101, 103 (Tex. Crim. App. 2004). He argues, however, that this case presents an exception to the rule because the acts of restraining Tomlin and causing him to lie face down were necessary parts of a single means of causing death by positional asphyxiation. Appellant urges that charging these acts in the disjunctive improperly allowed a conviction if the jury found that appellant had just restrained Tomlin, without requiring the jury to find that appellant had also caused Tomlin to be in the prone position that caused his death from positional asphyxiation. He reasons that the disjunctive language allowed conviction under a theory not contained in the indictment.

We are not persuaded that charging the acts in the disjunctive impermissibly allowed

conviction under a theory not contained in the indictment. *See, e.g., Zanghetti v. State,* 618 S.W.2d 383, 387 (Tex. Crim. App. 1981) (when indictment alleged appellant committed murder by striking victim in the head with a glass bottle, a piece of wood, and by means unknown, jury was properly instructed in the disjunctive); *Medina v. State,* 49 S.W. 380, 380-81 (Tex. Crim. App. 1899) (indictment charged that appellant caused victim's death by beating, starving, and hanging with a rope; proof of any one cause would be sufficient, or, "if all were proved, and together they co-operated to produce the death," that would also be sufficient). Finally, even if we were to assume error, the record does not show egregious harm. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

Appellant also asserts that there was no evidence to support a theory that he caused Tomlin's death by restraint alone. "It is settled that 'when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any of the acts charged.'" *Kitchens v. State,* 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (quoting *Turner v. United States,* 396 U.S. 398, 420 (1970)). Appellant does not complain that there was insufficient evidence that he intentionally caused Tomlin's death by positional asphyxiation or smothering, and the record shows that the evidence presented at trial was sufficient. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

The jury was charged that it could not find appellant guilty of capital murder unless it found beyond a reasonable doubt that he had intentionally caused Tomlin's death. Charging the acts in the disjunctive was not error, much less egregious error. The evidence

was sufficient to support a finding of guilt under one or more of the means alleged, and the jury properly returned a general verdict. Point of error one is overruled.

## SPECIAL ISSUES NOT CHARGED IN INDICTMENT

In point of error two, appellant claims that the trial court erred in overruling his motions to preclude the death penalty as a sentencing option and declare Article 37.071 unconstitutional on the ground that Texas law allows for a death sentence without grand-jury review of the special issues. He reasons that the special issues are "aggravated factors" that, as elements of the offense, must be pleaded in the indictment and proven beyond a reasonable doubt. He also asserts that the current statutory scheme violates due process because it allows the State to bypass the grand jury and arbitrarily determine who is "death worthy."

We have rejected these arguments in previous cases. *Joubert v. State,* 235 S.W.3d 729, 731-32 (Tex. Crim. App. 2007), *cert. denied,* 128 S. Ct. 1446 (2008); *Renteria v. State,* 206 S.W.3d 689, 709 (Tex. Crim. App. 2006). We are not persuaded to reconsider them here. Point of error two is overruled.

## MOTION TO SUPPRESS APPELLANT'S STATEMENT

In point of error three, appellant claims that the trial court erred in overruling his motion to suppress the second written statement obtained by police because that statement was given after the appointment of counsel, and the State did not meet its burden to show

appellant had voluntarily waived the presence of counsel.[2]  He argues that, because he had requested counsel at the arraignment, the State's showing that he later re-initiated communication with Detective Johnson, and that Detective Johnson read him his *Miranda* rights and obtained an acknowledgment and waiver, was insufficient to establish a voluntary waiver of the right to counsel.[3]

The grounds that appellant raised in his motions to suppress do not comport with his ground of error on appeal.  In his pre-trial motions to suppress, appellant asserted that his statements to police were the products of an illegal arrest and/or an illegal search and seizure. The testimony and argument at the pre-trial hearing on these motions were addressed to the claims raised in the motions and to the voluntariness of the statements.  Counsel did not argue that appellant's right to counsel had been violated.  In closing, he objected that the statements were not voluntary.  The court found the statements were voluntary and denied the motions to suppress.

After his motions to suppress had been denied and during the *voir dire* of Detective Johnson at trial, counsel objected for the first time that appellant's second statement was inadmissible because he had invoked his right to counsel by signing a request for the appointment of counsel at the arraignment.  The prosecutor responded that appellant had re-

---

[2]  The record reflects that two motions to suppress were filed, but appellant refers to only one motion.

[3]  *Miranda v. Arizona,* 384 U.S. 436 (1966).

initiated communication with Detective Johnson.[4]  The trial court admitted the second statement, finding that appellant had knowingly, intelligently, and voluntarily waived his right to counsel and his right to remain silent.

Even assuming *arguendo* that appellant preserved error, his claim fails on the merits. Appellant validly waived his right to counsel when he re-initiated communication with Detective Johnson.  *See Cross v. State,* 144 S.W.3d 521, 526-527 (Tex. Crim. App. 2004); *Fuller v. State,* 829 S.W.2d 191, 205 (Tex. Crim. App. 1992).  The trial court did not err in admitting appellant's second statement.  Point of error three is overruled.

## 10-12 RULE

In points of error four and seven, appellant claims that the trial court erred in overruling appellant's "federal constitution based objection to the so called '10-12' Rule," and he further claims the trial court erred in failing to instruct the jury that if a single juror "holds out" for life, the appellant would receive a sentence of life imprisonment by operation of law.  He asserts that the 10-12 Rule violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because it invades the province of the jury and unduly pressures jurors to change their votes in order to reach a result.  We have rejected these arguments in previous cases.  *See, e.g., Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007), *cert. denied,* 128 S.Ct. 627 (2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999).  We are not persuaded to revisit them here.  Points of error four and

---

[4] Appellant did not argue before the trial court, and he does not argue now, that he did not in fact re-initiate communication with Detective Johnson.

seven are overruled.

## MITIGATION SPECIAL ISSUE

In point of error five, appellant claims that the trial court erred in overruling defense counsel's objection to the submission of the mitigation special issue on grounds that it failed to place the burden of proof on the State, in violation of the Fifth and Sixth Amendments to the United States Constitution. He asserts that failing to instruct the jury that the State has the burden of proof deprived him of the right to trial by jury and the right to have all elements proven beyond a reasonable doubt. We have rejected this argument before. *Ladd v. State,* 3 S.W.3d 547, 573 (Tex. Crim. App. 1999). Point of error five is overruled.

In point of error six, appellant claims that the trial court erred in overruling appellant's objection to the failure of the mitigation instruction to require the jurors to find that the aggravating circumstances outweighed the mitigating circumstances before returning a verdict requiring the imposition of death. He asserts that the jury should have been instructed that, if it had a reasonable doubt as to whether the aggravating factors outweighed the mitigating factors, then it should have answered the mitigation special issue in the affirmative. He acknowledges that we have rejected similar arguments in previous cases. *See, e.g., Hankins v. State,* 132 S.W.3d 380 (Tex. Crim. App. 2004); *Blue v. State,* 125 S.W.3d 491 (Tex. Crim. App. 2003). We are not persuaded to reconsider the issue here. Point of error six is overruled.

In point of error ten, appellant claims that the mitigation special issue provided by

Article 37.071 is unconstitutionally vague and indefinite, in violation of appellant's rights under the Fourteenth Amendment of the United States Constitution, and Article I, section 19, of the Texas Constitution. He admits that we have rejected similar arguments before. *See, e.g., Feldman v. State,* 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Ladd,* 3 S.W.3d at 573. He invites the Court to revisit the issue because the record in this case "clearly rebuts" the presumption that jurors understand the terms used in the special issues and "reflects the public's confusion" on the question of what properly constitutes mitigating evidence in a capital case. Appellant has not persuaded us to revisit this issue. Point of error ten is overruled.

## EXECUTION PROTOCOL

In points of error eight and nine, appellant claims that the use of pancuronium bromide in the lethal-injection protocol violates the Eighth Amendment of the United States Constitution and Article I, section 13, of the Texas Constitution. He suggests that, because Texas has specifically banned the use of pancuronium bromide in the euthanization of animals on humanitarian grounds, the state constitutional protection may be greater than the federal constitutional protection.

Appellant's execution is not imminent; therefore, the method in which the lethal injection is currently administered is not determinative of the way it will be administered at the moment of appellant's execution. These claims are not ripe for review. *See Gallo v. State,* 239 S.W.3d 757, 780 (Tex. Crim. App. 2007). Points of error eight and nine are

overruled.

We affirm the judgment of the trial court.

DELIVERED JANUARY 14, 2009

DO NOT PUBLISH