

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,270

### DEMONTRELL LAMAR MILLER, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 241-1251-08
### IN THE 241ST DISTRICT COURT
### SMITH COUNTY

ALCALA, J. delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, KEASLER, HERVEY, and COCHRAN, JJ., joined. KELLER, P.J., joined, except for point 8, in which she concurred. JOHNSON, J., concurred in the judgment.

## O P I N I O N

This is a direct appeal filed by Demontrell Lamar Miller, appellant, who was convicted in November 2009 of capital murder. TEX. PENAL CODE § 19.03(a)(8). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure

Article 37.071, sections 2(b) and 2(e), the trial court sentenced appellant to death. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1]  After reviewing appellant's twenty-eight points of error, we conclude they are without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## Factual Background

At 12:56 p.m. on Sunday, June 1, 2008, emergency responders were dispatched to an apartment where appellant lived with his girlfriend, Ceola Pinson; their infant son, Jakayden ("Ty"); and two-year-old Kelynn, who was Ceola's son from a previous relationship. Paramedics noted that Kelynn was cold, non-responsive, and had no heartbeat. His underwear contained bloody stool.  Kelynn was taken by ambulance to the hospital, where he was pronounced dead at 1:35 p.m. The doctor who pronounced him dead noted that Kelynn's core body temperature was 91.1 degrees Fahrenheit and his body was in rigor mortis.  Appellant was charged with intentionally or knowingly causing the death of Kelynn Pinson,[2] an individual younger than six years of age, by striking him with his hand, foot, and unknown hard and blunt objects, and by striking him against unknown hard and blunt objects.

---

[1]     Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

[2]     The spelling of the victim's and several witnesses' names vary throughout the record on appeal.  We have adopted the spelling of the victim's name that was provided in the indictment, and the spellings of witnesses' names that were provided by the witnesses when they were sworn in at trial.

Kelynn's paternal grandmother, Linda Franklin, testified that Kelynn had stayed with her family the week before he died, and he was fine when she and Kelynn's father, Kelvin Arterberry, took him back to Ceola's apartment on Friday night. Kelynn spent about half of every month with Linda. During a previous visit a couple of weeks earlier, Linda noticed that Kelynn was sore in the area of his rib cage under his arm when she tried to pick him up. When she asked him what had happened, he said that appellant threw him into a wall. She asked Kelynn where his mother was when that happened, and Kelynn said that she was on the floor.

Ceola acknowledged in her testimony that Kelynn was sore in the area of his rib cage under his arm when she tried to pick him up a few weeks before his death, but she denied knowing how it had happened. Ceola also testified that she had told appellant not to spank Kelynn any more after she discovered red welts on Kelynn's body. On another occasion, Kelynn's shoulder was sore and he had trouble lifting his arm, but Ceola thought that these symptoms were caused by his sliding down into the space between the bed and the wall while he was sleeping.

Linda testified that Kelynn often cried when she took him home, especially if Ceola was not there. To stop Kelynn from misbehaving at her house, Linda sometimes threatened to take him home, and Kelynn would become fearful and say, "No." Ceola also acknowledged that Kelynn would become fearful if she threatened to tell appellant that he was misbehaving. She stated that Kelynn did not "take to" appellant in the way he took to

others, and she acknowledged that she once asked Kelynn why he did not like appellant. In his second statement to police, appellant denied that Kelynn was afraid of him, but he admitted that Kelynn knew not to come into the room or interrupt when appellant was watching TV or playing video games.

During Kelynn's week-long stay with Linda shortly before his death, Linda bathed him every day, and she did not notice any bruising or injuries except for some scratches on his legs that he got from running through her neighbor's rose bushes. Kelynn's father, Kelvin, also testified and confirmed that Kelynn had been fine when they dropped him off at Ceola's apartment on Friday night. Kelvin identified a photograph of him and Kelynn together that he had taken with his cell phone on Friday morning. In that picture, Kelynn was smiling and did not have any visible bruising.

Ceola also testified that Kelynn had been fine when Linda and Kelvin dropped him off with her on Friday night. She stated that she and the children spent a quiet evening at home. She and Kelynn sat on the couch and read books together. Appellant was not there for most of the evening. When appellant returned from a club around 3:00 a.m., he called Ceola to unlock the front door for him, and he went to bed. The family went out to eat after appellant woke up between 1:00 p.m. and 2:00 p.m. on Saturday. Appellant and Ceola decided to go to Dallas with some friends that afternoon and left the children with Ceola's friend, Dakeidra Choice. Dakeidra testified that she babysat Kelynn many times. On that evening, Kelynn seemed to have a normal appetite, and she did not notice anything wrong

with him.  Kelynn rode a "Big Wheel" around the apartment and walked to the mailboxes with Dakeidra and her children.  Two other adults who were present in Dakeidra's apartment that evening also testified that Kelynn seemed fine.  Some time after supper, Kelynn asked for and was given a snack, which he ate.  Dakeidra did not notice any injuries or bruises when she gave Kelynn a bath and put him to bed after 10:00 p.m.  Kelynn and Ty were sleeping when Ceola and appellant came by around 2:00 a.m. on Sunday to pick them up.

Ceola testified that on the way home, Kelynn woke up and complained that he was thirsty, but he went back to sleep after they got home.  She heard a thump while she was taking a bath and she called out to Kelynn, who said that he was all right.  Before she left for work around 5:30 a.m. on Sunday, Ceola saw Kelynn asleep in his bed.  She checked his pull-up, which was clean, and she moved him to the couch so that when he woke up, he could watch cartoons without disturbing appellant.  Kelynn did not wake up, but he squirmed to get comfortable on the couch.  When Ceola stopped by the apartment around 9:00 a.m. to drop off baby formula for Ty, Kelynn was still asleep on the couch, and she did not notice anything wrong with him.  She spoke with appellant for a few minutes and then went back to work.

At 12:40 p.m., Ceola received a telephone call from appellant, telling her to come home right away because something had happened to Kelynn. She told appellant to call 9-1-1, and she started for home.  When she arrived, the front door was locked, and she yelled for appellant to open it.  After appellant opened the door, Ceola and her neighbor, Yolanda

Williams, entered the apartment. Kelynn was lying on the living-room floor. Ceola asked appellant whether he had called 9-1-1, and then without waiting for an answer, she called 9-1-1 herself. Yolanda attempted to revive Kelynn by performing cardiopulmonary resuscitation ("CPR"). At that point, Ceola observed a bruise developing around Kelynn's eye. Paramedics arrived about four minutes after Ceola called 9-1-1, and Yolanda carried Kelynn outside to them. Ceola accompanied Kelynn in the ambulance, but he never regained consciousness. A friend who met her at the hospital testified that while they were waiting, Ceola was hysterical, and she kept asking appellant questions, but appellant hung his head and did not say very much.

In appellant's statements to police, he acknowledged that Kelynn seemed fine on Saturday afternoon, and Kelynn was still fine when they picked him up from Dakeidra's apartment. Appellant heard Ceola leave for work around 5:30 a.m. on Sunday morning, but he stayed in bed and went back to sleep. Around 7:00 a.m., he woke up to give Ty a bottle. He then went back to bed. Later, when Ceola called, he told her that they were out of baby formula. Kelynn was still asleep when Ceola dropped off the formula, and appellant went back to bed after she left. Around 11:30 a.m., appellant got out of bed and woke Kelynn up because he thought Kelynn might be hungry. Appellant fixed Kelynn a sandwich and some cereal with milk, which Kelynn ate. Kelynn asked appellant to take him swimming, and appellant told him no. However, after appellant went back into his bedroom to watch television, he changed his mind and told Kelynn they could go swimming.

To get him ready to go to the pool, appellant removed Kelynn's orange shirt and dirty pull-up and used two "wet wipes" to clean Kelynn before dressing him in underwear and plaid shorts. Appellant placed the used wipes, together with the dirty pull-up, inside a cereal box in the trash. Appellant did not notice any injuries on Kelynn's body except for one bruise on his left shoulder. Kelynn was in a good mood and was excited about going swimming when appellant took him and Ty to the pool.

Appellant related that after they had been at the pool for a few minutes, Ty started crying, so appellant told Kelynn to sit in a chair by the pool while he carried Ty back to their second-floor apartment to get a baby bottle. Appellant left Kelynn alone for only a couple of minutes but when he looked outside, he could not see Kelynn. He stepped out onto the breezeway and loudly called Kelynn's name twice, but he received no response, so he left Ty in the apartment and hurried down to the pool.

When appellant returned to the pool, he saw that Kelynn was holding onto the pool ladder and floating with his face in the water. He thought that Kelynn was dead. However, after appellant pulled Kelynn out of the water and delivered a single open-handed blow to his chest, Kelynn jumped up, opened his eyes wide, and asked for something to eat. Appellant carried him back to the apartment because Kelynn was too sluggish to walk up the stairs by himself. Kelynn coughed up a white mucus-like substance onto appellant's shoulder. When they got back into the apartment, appellant wiped the substance off with a black shirt. Appellant sat Kelynn down on the couch and gave him Sprite in a sippy cup, and

then went to look for some dry clothes to change him into. When appellant next looked at Kelynn, he saw that his eyes were rolling back in his head. Kelynn's breathing and heartbeat were not normal, so appellant began performing CPR. He stopped to call Ceola, who told him to call 9-1-1, but he did not call 9-1-1 because he was scared and trying to do CPR. He was still administering CPR when he heard Ceola at the front door. Appellant got up to let her in, and their neighbor "Yawny" accompanied Ceola into the apartment and began performing CPR on Kelynn while Ceola called 9-1-1.

Appellant added or changed some details in his second statement to police. Specifically, in his second statement, appellant related that, after Ceola dropped off the baby formula for Ty, appellant went to the bedroom and watched an 80-minute movie before Kelynn woke up. Appellant also stated that Ceola did not tell him to call 9-1-1 when he told her that something had happened to Kelynn. Appellant further added that Kelynn coughed something up onto the carpet while appellant was attempting to perform CPR, and appellant turned him over to try to let the substance drain out of Kelynn's mouth. Appellant moistened a towel and used it to wipe the mess. He had used the same towel earlier when Kelynn coughed up a white substance on their way back from the pool.

In both his statements to police, appellant failed to mention that he had a phone conversation with his cousin, Antron Gardner, that day. However, Gardner testified that he and appellant spoke on the telephone around noon, and they talked about the good-looking girls they had seen when they were at a club together on Friday night. Gardner's phone

records, which were introduced into evidence, indicated that appellant called Gardner's number three times around 11:58 a.m., and they spoke at 12:34 p.m. in a call that lasted 50 seconds. Gardner testified that he did not answer appellant's initial calls because he was sleeping, but he called appellant back when he woke up. After they talked for a few seconds, appellant told him he needed to go because he had left Kelynn at the pool. Gardner testified that appellant sounded calm during that conversation, but when Gardner saw him at the hospital around 4:00 p.m., appellant cried and stated that he was "going to hell." Ceola testified that, after that day, she never asked appellant what had happened, and appellant never told her, but he did tell her that Kelynn's "blood was on [his] hands." She acknowledged that she later told a psychologist that Kelynn would still be alive if she had left appellant. She testified that she did not know why she said that.

Deputy Sheriff Clifton Hunter, the apartment complex's courtesy officer, testified that he unlocked the gate to the pool at 12:30 p.m. on Sunday and saw no evidence that anyone was there or had been there. He also testified that he received a call on his cell phone as he was leaving the pool area, and he stayed outside on the breezeway in front of his second-floor apartment for several minutes while he was talking on the phone. His cell-phone records confirmed that he received a call at 12:31 p.m., and he testified that the call lasted for about three minutes. He had a view of the pool from the breezeway in front of his apartment. Appellant's apartment also faced onto the breezeway and had a view of the pool. Deputy Hunter testified that he would have been able to see anyone going back and forth between

appellant's apartment and the pool, but he did not see anyone. In addition, he would have been able to hear a noise at the pool if someone fell in, and he would have heard anyone who called out from the breezeway to someone in the pool area. However, he did not see or hear anything like that while he was outside. Officer James Holt, who secured the pool area after he responded to the 9-1-1 call, testified that he saw no evidence that anyone had been at the pool that day.

Casey DuPont, a forensic scientist, testified about blood tests and DNA analyses that she had conducted on items that had been recovered from Kelynn and from the apartment following Kelynn's death. Kelynn's orange tank top had multiple areas of red staining, which tested presumptively positive for blood. DuPont conducted a deoxyribonucleic acid ("DNA") analysis on a stain near the neck area and obtained a DNA profile that matched Kelynn's. The plaid shorts and underwear that Kelynn was wearing when he was taken to the hospital contained a large amount of fecal matter as well as a large amount of brown staining that tested presumptively positive for blood. DuPont could not obtain a DNA profile because DNA would be degraded by the presence of fecal matter.

A cereal box containing two "wet wipes" had been found in the trash. One wipe had dark material that resembled the fecal matter found on Kelynn's shorts. The other wipe had lighter stains. Both wipes tested presumptively positive for blood. DuPont did not obtain a DNA profile because it appeared that the majority of the dark stain was fecal matter, with blood as a minor component.

A black T-shirt that purportedly belonged to appellant was tested. It had a white stain that appeared to be of biological origin and did not test presumptively positive for blood. However, a DNA profile obtained from the stain was consistent with Kelynn's, indicating that the substance was fluid from Kelynn's body.

A section of carpet that had been cut from the living room floor had a large reddish-brown stain that tested presumptively positive for blood, and DuPont obtained a partial DNA profile that was consistent with Kelynn's.

A white towel recovered from the living room floor had eighteen areas of red staining on the towel that tested presumptively positive for blood. DuPont conducted a DNA analysis on one area and obtained a DNA profile that was consistent with Kelynn's.

Dr. Reade Quinton, the Dallas County Medical Examiner who performed the autopsy, described the condition of Kelynn's body and the numerous bruises and internal injuries that he had sustained. Kelynn's stomach contained only dark brown fluid, which was not consistent with his having eaten any food on Sunday morning unless he vomited afterward. The bruises on Kelynn's body probably would have been visible within half an hour, and certainly no later than a couple of hours, after the impacts that caused them. Dr. Quinton opined that Kelynn's internal abdominal injuries were inflicted by multiple blunt-force impacts which most likely occurred around the same time, although the injuries could have been inflicted over the course of several hours or even over the course of a day. Kelynn sustained a number of tears to the mesentery that were probably inflicted within thirty hours

of death, including a severe tear that was probably inflicted within three hours of death. This tear would have been immediately followed by active bleeding into the abdominal cavity, which would have caused severe pain. Kelynn's distress would have been readily apparent to his caregivers and most likely would have prevented him from engaging in ordinary activities like eating and playing. Kelynn's injuries would have produced immediate symptoms that would have grown continually worse until he died. Although in some cases a child might live for several days with a torn mesentery, Dr. Quinton was unaware of any child who had lived that long after suffering injuries as extensive as Kelynn's.

Dr. Quinton opined that Kelynn would not have died immediately. If Kelynn was non-responsive when emergency responders reached him at 12:56 p.m., then his abdominal injuries were present before 11:30 a.m. "Based on the way the injuries looked," Dr. Quinton doubted that Kelynn would have been very communicative by 11:30 a.m., and certainly he would not have been hungry. Dr. Quinton opined that appellant's account of events, in which Kelynn was alert and wanting to go swimming around 11:30 a.m., became unconscious in the water but quickly revived, was asking for something to eat and was drinking from a sippy cup around 12:35 p.m. or 12:40 p.m., but then suddenly went into distress and was non-responsive by 12:56 p.m., was not medically likely.

Dr. Quinton further testified that, based on the location and severity of Kelynn's abdominal injuries, they were not the result of CPR or efforts to revive him. In addition, the autopsy revealed a previously fractured rib that had begun healing but had been broken again

within thirty hours of Kelynn's death. Based on the unusual posterior location of the fracture and the fact that Kelynn incurred the same injury twice in the same unusual location, it was very unlikely that this injury was accidental.

Dr. Stephen Pustilnik, the Chief Medical Examiner for Galveston County, testified for the defense. He acknowledged that Kelynn's injuries were dramatic, but he believed that some of them were at least twenty-four hours old and that the mesenterial tearing was inflicted a day or more before Kelynn's death. On cross-examination, he acknowledged that he had told Dr. Quinton that he thought the mesenterial tearing was inflicted at least eight hours before death. He also acknowledged that bruises like those seen on Kelynn's skin would probably become apparent within thirty minutes of the impacts that caused them.

Dr. Harry Wilson, a pediatric pathologist, testified for the State. He had reviewed the autopsy results and observed that Kelynn's brain was swollen, which indicated that Kelynn did not die immediately after he was injured and that he had probably gone into shock. Dr. Wilson also opined that, based on the coloring of some of Kelynn's abdominal tissues, he had suffered a previous internal abdominal injury that was roughly a week old. The new mesenterial tears were probably inflicted between one and four hours before his death. Dr. Wilson opined that Kelynn would have been in obvious pain and distress because of the blood pooling in his abdomen, and he would have lost consciousness as a result of his brain swelling. Kelynn's distress from these injuries would have been apparent to his caregivers. Dr. Wilson also testified that if Kelynn's caregivers on the Friday and Saturday before his

death observed that he seemed normal and that he did not have any noticeable bruising, then Kelynn did not have these injuries when he was with them. Dr. Wilson opined that appellant's account of events leading up to Kelynn's death had to be false.

## Sufficiency of the Evidence at Guilt Phase

In point of error one, appellant alleges that the evidence is insufficient to support his conviction for capital murder. Specifically, he complains that many adults had access to Kelynn during the time period when the fatal injuries could have been inflicted. Appellant argues that evidence that he was the most likely perpetrator is insufficient to sustain the verdict.

In determining whether the evidence is sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979); *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Lucio v. State,* 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). Each fact need not point directly and independently to the guilt of the appellant, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper,* 214 S.W.3d at 13.

The evidence in this case shows that appellant was Kelynn's sole caregiver when the fatal injuries were inflicted. Although expert medical testimony acknowledged that a child could survive injuries like those inflicted on Kelynn for several days, expert testimony established that it was highly unlikely that a child with injuries as severe as Kelynn's would survive for more than a few hours. The expert testimony explained that a child who had suffered injuries like those inflicted on Kelynn would immediately experience symptoms that would grow continually worse and that his distress would be apparent to his caregivers. Kelynn's blood was found in stains on his own clothes and on various items in the apartment that appellant had identified while telling police his versions of events leading up to Kelynn's death. In addition, it was undisputed that the visible multiple bruises on Kelynn's body would have appeared within a couple of hours of the impacts that caused them, and no adult saw those bruises until after Kelynn had been in appellant's sole care for several hours.

Ceola and appellant, as well as other adults who took care of Kelynn on Friday and Saturday, stated that Kelynn seemed fine through the time when Ceola and appellant picked up the children from Dakeidra's apartment at 2:00 a.m. on Sunday. Ceola stated that she checked on Kelynn before she left for work around 5:30 a.m. and that he squirmed after she moved him to the couch. Ceola and appellant both stated that appellant was alone with the children after Ceola left for work, and that Kelynn was still asleep when Ceola stopped by mid-morning to drop off baby formula for Ty. Kelynn seemed fine during this period.

Appellant's versions of events from the time that Ceola left him alone with Kelynn

and Ty until the time that Ceola returned to the apartment and called 9-1-1 were not consistent with testimony that no one had been to the pool, evidence of Kelynn's blood on Kelynn's clothes and inside the apartment, and autopsy results reflecting that Kelynn had been beaten to death. The State's medical experts testified that appellant's account of Kelynn's condition and behavior that day was not medically likely and had to be false.

The State also presented evidence that appellant had abused Kelynn in the past, including breaking his rib by throwing him into a wall and spanking him so hard that red welts appeared on his skin. Appellant told Gardner at the hospital that he was "going to hell," and he later told Ceola that Kelynn's "blood was on [his] hands." A jury could reasonably infer from this evidence that appellant caused Kelynn's fatal injuries. *See Lucio,* 351 S.W.3d at 895. The cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper,* 214 S.W.3d at 13. Point of error one is overruled.

## Summaries of Testimony

Appellant presents three points of error challenging the admission of summaries of the testimony of Dr. Quinton, Detective David Matthews, and Ceola Pinson. In point of error two, appellant complains that the trial court erred by admitting the prosecutor's summary of Dr. Quinton's testimony because the summary is inadmissible hearsay and does not fall within the ambit of Rules 107 or 1006 of the Texas Rules of Evidence.[3] *See* TEX. R. EVID. 107, 1006. He argues that the harm analysis should be conducted under Texas Rule of

---

[3] Unless otherwise indicated, all references to Rules refer to the Texas Rules of Evidence.

Appellate Procedure 44.2(a) because the error violated the Confrontation Clause. *See* TEX.

R. APP. P. 44.2(a). Appellant cites to two opinions that address the admissibility of

summaries under Rule 1006. *See* TEX. R. EVID. 1006; *Wheatfall v. State,* 882 S.W.2d 829

(Tex. Crim. App. 1994); *Callahan v. State,* 937 S.W.2d 553 (Tex. App.—Texarkana 1996,

no pet.). In support of his allegation of harm, appellant argues that submitting the opinion

of one expert in note form as evidence, when other experts with different opinions also

testified about the matter but none of their testimony was submitted in note form, had the

effect of accentuating Dr. Quinton's opinion over other expert witnesses' opinions.

When the prosecutor offered the notes into evidence at trial, appellant objected that

the admission of the summary violated the rules of procedure, "particularly . . . procedural

due process with respect to my client's constitutional rights under the Fourteenth Amendment

and denies him a fair trial." He complained that the jury should not be able to take

"summarized conclusions of the prosecutors" into the jury room and that allowing this was

fundamentally unfair and denied appellant equal protection. The prosecutor responded that

the summary was Dr. Quinton's conclusions that had already been presented to the jury and

that it was admissible as a witness statement.

Appellant's point of error on appeal, challenging the notes under the rules of evidence,

does not comport with his trial objections on the grounds of rules of procedure, due process,

equal protection, and "fairness." *See* TEX. R. APP. P. 33.1(a). Furthermore, his claims are

inadequately briefed because appellant provides no legal argument for his complaints that

the summary is inadmissible hearsay and that its admission violated the Confrontation Clause. *See id.* Rule 38.1(h); *see also Lucio,* 351 S.W.3d at 896. Therefore, we decline to address this claim. Point of error two is overruled.

In point of error three, appellant complains that the trial court erred by admitting the prosecutor's summary of Detective Dennis Matthews's testimony because the summary is inadmissible hearsay and does not fall within the ambit of Rule 107. *See* TEX. R. EVID. 107. He argues that the harm analysis should be conducted under Texas Rule of Appellate Procedure 44.2(a) because the error violated the Confrontation Clause. *See* TEX. R. APP. P. 44.2(a). Appellant describes the summary as "conclusions of the prosecutor from the statements and conclusions from the [sic] Detective Matthews with respect to the evidence that's been presented." In support of his complaint, appellant states, "Pursuant to the argument contained Issue No. 9. [sic] Appellant incorporates said arguments by reference and argues that the admission of State's Exhibit 175 was error." We infer from this language that appellant means to incorporate his argument from point of error two into point of error three. He asserts that the error was harmful because "it unnecessarily drew the attention of the jury to a particular piece of evidence."

At trial, appellant objected to the admission of this summary on grounds that it was "not evidence" and that it contained conclusions of the prosecutor with respect to the evidence that had been presented. He argued that the "best evidence" of appellant's statements to police was the audiovisual recordings of those statements and that the jury

should be able to review those recordings "without the benefit of the aid and assistance of the prosecutor's and witness' [sic] conclusions with respect to" the contents of the recordings. He further objected that admitting the summary would violate his constitutional rights to procedural due process and equal protection and would deny him a fair trial.

Appellant's point of error on appeal does not comport with his trial objections. *See* TEX. R. APP. P. 33.1(a). Furthermore, his claims are inadequately briefed because he provides no legal argument for his complaints that the summary is inadmissible hearsay and contains inadmissible conclusions and that its admission violated the Confrontation Clause. *See* TEX. R. APP. P. 38.1(h). Therefore, we decline to address this claim. Point of error three is overruled.

In point of error four, appellant complains that the trial court erred by admitting the prosecutor's summary of Ceola Pinson's testimony because the summary is inadmissible hearsay and does not fall within the ambit of Rule 107. *See* TEX. R. EVID. 107. In support of his complaint, appellant "incorporates by reference the arguments made in Issue No. 9 [sic]." We infer from this language that appellant means to incorporate his argument from point of error two into this point of error.

At trial, appellant objected to the admission of this summary on grounds that its admission violated procedural due process and equal protection and deprived appellant of his right to a fair trial. Counsel also objected that admitting the summary, which was the prosecutor's notes, undermined the rationale behind the rule that the jurors themselves were

not allowed to take notes, and that the exhibit contained the prosecutor's conclusions.

Appellant's point of error on appeal does not comport with his trial objections. *See* TEX. R. APP. P. 33.1(a). Furthermore, his claims are inadequately briefed because appellant provides no legal argument for his complaints that the summary is inadmissible hearsay and that its admission violated the Confrontation Clause. *See id.* Rule 38.1(h). Therefore, we decline to address this claim. Point of error four is overruled.

### Autopsy Photograph

In his fifth point of error, appellant asserts that the trial court erred by applying the Rule 403 balancing test to State's Exhibit 103 because the prejudicial effect of this autopsy photograph outweighed any probative value. *See* TEX R. EVID. 403. Appellant acknowledges that the photograph is relevant but argues that the prosecutor's need for it was minimal, the photograph was gruesome, and the degree of mutilation from the autopsy played on jurors' emotions and pushed them toward an irrational verdict.

State's Exhibit 103 is an approximately life-sized autopsy photograph of Kelynn's body viewed from behind, with the skin of his arms, legs, neck, and back reflected. The photograph measures approximately 30 inches by 23 inches. Kelynn's feet and the top of his head are not visible because they extend past the edge of the photograph, but all of the rest of his body is visible. The photograph is in color.

The trial court held a hearing outside the presence of the jury to determine the admissibility of this and other autopsy photographs. Dr. Quinton testified at the hearing that

the photo showed one of the procedures that medical examiners follow in a case where there are multiple injuries. He explained that the skin of the entire back and extremities was reflected so that the examiner could look for any additional bruising that might not be apparent externally. The photo showed two small bruises on the midline of Kelynn's back and additional bruises on the right side of the back. Dr. Quinton confirmed that the photograph was a visual depiction of the injuries that he planned to describe to the jury. It showed the location of bruising on Kelynn's back and the fact that there were multiple impacts to his back area. Dr. Quinton acknowledged that the photograph was gruesome.

On cross-examination, defense counsel described this photograph as representing "a human fillet of the body of that child." Dr. Quinton again explained that the photo depicted part of the procedure that the medical examiner followed in evaluating the body for injury. He explained that Kelynn's dark pigmentation made it difficult to see external bruising and that this procedure enabled the examiner to see bruising that was deeper than the surface of the skin. Although the bruises on the right side of Kelynn's back were visible externally, the two midline bruises were not visible externally or in the other photographs that would be presented to the jury.

Dr. Quinton acknowledged that these injuries could be shown in a diagram or in another photograph that was a close-up of the midline bruises that did not show "the entire thing." He also acknowledged that he could simply describe the injuries verbally. Dr. Quinton, however, opined that the photo would be better than a diagram for demonstrating

the location, extent, and coloring of the injuries.

Defense counsel objected at the pretrial hearing and at trial on grounds that the photograph was so prejudicial that it would deprive appellant of procedural due process, equal protection, and a fair and impartial trial. She argued that a diagram or another photograph could be used to assist Dr. Quinton in explaining those injuries. She acknowledged that the photo was relevant but asserted that its prejudicial effect would completely outweigh its probative value.

The trial court found that the photo was admissible and made detailed findings on the record to explain its reasoning. The court cited *Gallo v. State,* 239 S.W.3d 757, 762 (Tex. Crim. App. 2007), for the general principle that a photograph is admissible if verbal testimony concerning the matter depicted in the photograph is also admissible. The court noted that, as this Court stated in *Gallo*, Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Id.* (citing TEX. R. EVID. 403). The court pointed out that in *Gallo,* the appellant complained of the admission of "numerous, repetitive, [and] gruesome" autopsy photographs of the three-year-old victim, but in the instant case, only one autopsy photograph was at issue. *Id*. As in *Gallo,* the challenged photograph depicted injuries that were not visible externally and that were inflicted shortly before death. Although the photograph was gruesome, there was no danger that the jury would attribute the mutilation caused by the autopsy procedure to the defendant.

The trial court also referred to *Rojas v. State,* 986 S.W.2d 241, 250 (Tex. Crim. App. 1998), which held that autopsy photos showing injuries to the victim's pelvic area, although those injuries were not the cause of death, were probative of the appellant's mental state at the time of the murder. They were evidence of the specific circumstances of the murder and of the fact that the appellant had omitted information from his statement to police. *Id.* at 249-50. The trial court also discussed *Avila v. State,* No. AP-74,142, 2003 Tex. Crim. App. LEXIS 142, *18-19 (Tex. Crim. App. July 2, 2003) (not designated for publication), which held that photographs depicting mutilation by the medical examiner were admissible when they showed bruising or other damage that was attributable to the defendant but not visible externally and, therefore, were highly relevant to the manner of death.

The trial court considered whether, as in *Avila,* the ultimate issue was seriously contested and whether the State had other convincing evidence to establish the ultimate issue. The State had the burden to prove that appellant intentionally or knowingly caused the death of the victim. Thus, the State had to prove, not only that appellant inflicted the injuries that led to the victim's death, but also that the injuries were intentionally inflicted with the intent to cause death.

Finally, the trial court cited *Martin v. State,* 475 S.W.2d 265, 267 (Tex. Crim. App. 1972), *overruled on other grounds by Jackson v. State*, 548 S.W.2d 685, 690 (Tex. Crim. App. 1977), for the holding that if a photograph is competent, material, and relevant to the issue on trial, it is not rendered inadmissible merely because it is gruesome or might tend to

arouse the passions of the jury. The trial court found that, in considering the testimony in this case and the elements in the indictment, the probative value of the photo was not substantially outweighed by the danger of unfair prejudice.

The admissibility of photographs over an objection is within the sound discretion of the trial court. *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). In this case, State's Exhibit 103 was the only photograph offered to show the midline bruises on Kelynn's back that were not visible externally. It showed the location of multiple bruises on Kelynn's back and multiple impacts. Dr. Quinton testified that this photograph demonstrated the location, extent, and coloring of the injuries more effectively than a diagram. Under the circumstances of this case, we cannot say that the trial court abused its discretion in ruling that the probative value of Exhibit 103 was not substantially outweighed by the danger of unfair prejudice. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Point of error five is overruled.

### Lesser-Included-Offense Instructions

In point of error six, appellant asserts that the trial court erred by denying his requested jury instruction on the lesser-included offense of felony murder, in violation of Article 36.19. *See* TEX. CODE CRIM. PROC. art. 36.19. He contends "from reading the record as a whole that a rational juror could have found that the [a]ppellant may have intended to commit the felony . . . injury to a child, but did not intend to cause the victim[']s death."

A charge on a lesser-included offense should be given when (1) the lesser-included

offense is included within the proof necessary to establish the offense charged; and (2) there is some evidence that would permit a rational jury to find that the defendant is guilty of the lesser offense but not guilty of the greater. *See Rousseau v. State,* 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993). Felony murder is a lesser-included offense of capital murder. *Salinas v. State,* 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). Thus, the first criterion is satisfied.

With regard to the second criterion, however, appellant fails to identify any evidence in the trial record that affirmatively shows that he did not intentionally or knowingly cause Kelynn's death but instead only intentionally, knowingly, recklessly, or with criminal negligence caused the injuries that led to Kelynn's death. *See Schweinle v. State,* 915 S.W.2d 17, 19 (Tex. Crim. App. 1996); *see also* TEX. PENAL CODE §§ 22.04(a), 22.04(c)(1). Nor does he identify any evidence that is subject to two different interpretations, one of which would negate an element of the offense of capital murder and establish felony murder as a valid, rational alternative. *See Schmidt v. State,* 278 S.W.3d 353, 362 & n.19 (Tex. Crim. App. 2009). Thus, appellant has failed to show that there is some evidence that would permit a rational jury to find that he is guilty of the lesser offense but not guilty of the greater. Appellant's sixth point of error is overruled.

In point of error seven, appellant asserts that the trial court erred in denying his requested jury instruction on the lesser-included offense of criminally negligent homicide, in violation of Article 36.19. His entire argument in support of this point is that he

"incorporates by reference the argument contained in Issue No. 14 [sic]." We infer from this language that appellant means to incorporate his argument from point of error six into this point of error. Thus, this point of error is inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Lucio,* 351 S.W.3d at 896-97. Appellant's seventh point of error is overruled.

### Cross-Examination of Punishment Character Witnesses

In points of error eight through eleven, appellant asserts that the trial court erred by overruling his objections to the improper examination by the prosecutor, of his character witnesses in the punishment phase of trial. He argues in his eighth point of error that the prosecutor's examination of Joshua Smith injected race into the trial, which was not relevant to any matter concerning appellant's character, and that the prosecutor's question was manifestly improper and constituted prosecutorial misconduct. Appellant also argues that, even if the evidence had some relevance under Rule 401, any probative value was outweighed by its extremely prejudicial effect under Rule 403. *See* TEX. R. EVID. 401, 403. In support of finding harm, appellant argues that the prosecutor's improper questioning violated due process and amounted to structural error requiring an automatic reversal on punishment.

On direct examination, Joshua testified that he met appellant when they were sophomores in high school. He testified that they were very close friends and they played a variety of sports together. They were both members of the high-school football team. Joshua described appellant as a leader on the team and a hard worker who was voted most

likely to succeed. They also played pool and video games together, and they spoke daily by phone. They took a trip to Dallas together the day before Kelynn was killed. Joshua testified that he visited appellant at appellant's mother's house on many occasions and observed appellant interacting with his siblings. Appellant's family was very close, and his siblings looked up to him as a "father figure." Appellant's mentally challenged brother, Dexter, looked up to appellant, wanted to be like him, and was happy to be around him. Appellant was also very close to his mother, and when he was away from home, he would call her and check up on the family.

Joshua further testified that he and appellant went to clubs together a couple of times each month and to gambling boats in Shreveport three or four times each month. Joshua thought that Ceola was jealous of the time that he and appellant spent together. He was shocked to learn that appellant had been charged with capital murder because that was uncharacteristic of appellant. He testified that he and appellant were a lot alike and that appellant was a great friend.

On cross-examination, the prosecutor asked Joshua, "You remember talking on the phone to [the] defendant and making some statements about the white folks in the court room? I can refresh your memory with the tape. You remember that?" Defense counsel asked to approach the bench. At the bench conference, defense counsel objected to the prosecutor's line of questioning on grounds that it was not relevant and was "quite prejudicial," arguing that it made no difference to the trial how Joshua felt about white

people. The prosecutor responded that Joshua's statement to the defendant, made during a telephone conversation on the previous evening after the trial adjourned for the day, was, "You're looking sharp today. White folks don't like it, all our folks being in there," and then the defendant answered, "Today went all right."

Defense counsel again asserted that the prosecutor should not interject race into the trial and that this line of questioning was not relevant to any issue. The prosecutor responded that it was relevant because

> what [Joshua is] talking about is that they've been loading this courtroom up, and by his own statement it's an effort to make us uncomfortable. And I think it goes directly to his bias to testify and his motive to testify. He's talking about the white folks don't like us being down there, I want to know what he's talking about.

Defense counsel argued again that Joshua's comment was not relevant, adding, "The bias would go toward his friendship with the defendant, not toward the racial remarks that he may have made during the course of the conversation."

The trial court overruled the objection, finding that this questioning was relevant to show Joshua's motive and bias in testifying. Defense counsel then inquired whether the court would give a limiting instruction on that basis, and the court stated there was nothing on which to instruct. The trial court stated, "If he's on the phone with the defendant making those type statements, it's something that the jury can consider in weighing his testimony, the credibility of his testimony, motive or bias of his testimony. That's the ruling."

The prosecutor then asked Joshua a compound question: "[I]sn't it true when talking

to the defendant, you said, 'You're looking sharp today. White folks don't like it, all our folks being down there,' what did you mean?" Joshua asked him to repeat the question. The prosecutor responded, "Sure. You told the defendant, four minutes and 25 seconds into your phone call, you said, 'You're looking sharp today. White folks don't like it, all our folks being in there.' What are you talking about? Because I can play it for you to refresh your memory." Joshua stated that he did not remember. The prosecutor then asked, "Are you saying you didn't say it?" Joshua responded, "I'm not saying I didn't say it, I just don't recall saying that."

Defense counsel again asked to approach the bench. She objected to the introduction of the recording, arguing that because the witness did not deny making the statement, there was no point in playing the recording. The prosecutor asserted that he could play the recording unless the witness "unequivocally admits to making the statement." The court overruled the objection.

Defense counsel also objected on the ground that a proper predicate had not been laid for the introduction of the recording. The prosecutor responded that he was not even "using" or "introducing" the recording, he was just impeaching the witness with it, which was "totally different." The court overruled the objection, and the prosecutor played the recording to the jury. The prosecutor then asked Joshua if that was his voice, and Joshua responded that he could not say whether it was his voice. The prosecutor played the recording a second time and again asked Joshua if that was his voice. Joshua then admitted that it was his voice.

The prosecutor then asked, "So what is it when you say that white folks don't like it? Who are you talking about?" Joshua responded, "Just people in general." The prosecutor persisted, "Well, no, you said that the white folks didn't like it. Didn't like what?" Joshua answered, "I mean, I don't know . . . I was meaning us being outside in the hallway." The prosecutor again asked, "What white folks don't like it? I mean, you made the statement?" Joshua responded again, "I mean, people don't like us being out in the hallway." The prosecutor kept on: "Who don't?" Joshua responded again, "Just people in general."

A party may cross-examine a witness to expose his bias or interest in testifying. TEX. R. EVID. 613(b). The trial court has discretion as to the extent of cross-examination of a witness for the showing of bias or as to credibility, and its decision is not subject to reversal on appeal absent a clear abuse of discretion. *Cantu v. State,* 939 S.W.2d 627, 635 (Tex. Crim. App. 1997). However, a party is not entitled to impeach a witness on a collateral matter. *Ramirez v. State,* 802 S.W.2d 674, 675 (Tex. Crim. App. 1990).

Joshua's detailed description of his close friendship with appellant provided ample evidence of his bias and motivation in testifying. The prosecutor's questions concerning Joshua's arguably racist comment about the "white folks" were not relevant to his credibility and were, at best, cumulative of already-introduced evidence of Joshua's bias in testifying as a character witness for appellant. These questions arguably created a risk of unfair prejudice by placing Joshua's own character in issue and portraying him as a racist who envisioned the trial as a conflict between the "white folks" and "our folks."

By asking Joshua if he made the "white folks" comment, the prosecutor elicited a response from a character witness for the sole purpose of introducing extraneous evidence to contradict the witness's response and place the witness's own character into issue. Such questioning was improper. *See TXI Transp. Co. v. Hughes,* 306 S.W.3d 230, 242 (Tex. 2010) (citing *Ramirez,* 802 S.W.2d at 675 (parties may not impeach on collateral or immaterial matters), and *Delamora v. State,* 128 S.W.3d 344, 363 (Tex. App.—Austin 2004, pet. ref'd) ("[a] party may not cross-examine a witness on a collateral matter, then contradict the witness's answer")); *but see Cantu,* 939 S.W.2d at 635 (asking character witness if she thought offense was funny and then introducing letter she had written which contradicted her denial was not improper impeachment on collateral matter). Thus, any marginal relevance of this line of questioning was substantially outweighed by the potential for unfair prejudice.

For non-constitutional error, as here, the improper admission of evidence is harmless when it does not affect the substantial rights to a fair sentencing trial. *See Coble v. State,* 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). In making a harm analysis, we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *Id.* The error is harmless if it did not influence the jury or had only a slight effect. *Id.*

In this case, Joshua was only one of several character witnesses who testified on appellant's behalf, and only his testimony was affected. In addition, Joshua's bias and character were challenged without objection in other ways. For example, the prosecutor

questioned Joshua about the fact that he and appellant's other friends and family members were wearing purple at the courthouse. Joshua testified, without objection, that appellant's mother had told them to wear purple in support of appellant and the family because it was the color of royalty. The prosecutor also questioned Joshua about an incident in which he received stolen shoes while appellant waited for him in the car, and another incident in which Joshua was present while appellant and appellant's sister confronted and beat up a woman who was dating appellant's sister's boyfriend. In light of this unobjected-to questioning about Joshua's bias and character, any error in admitting the "white folks" line of questioning was harmless in its impact on the jury's determination of Joshua's credibility. Furthermore, nothing in the prosecutor's questioning suggested that the improper racial comment was made by appellant or with his assent, and, therefore, no statement was attributable to him. We conclude the error was harmless because it did not affect appellant's substantial rights. Point of error eight is overruled.

In his ninth point of error, appellant complains that the trial court erred in overruling his objection to the State's improper cross-examination of his sister, Chineyere Jordan. He complains that the prosecutor's questioning of Chineyere about her mother's criminal history was outside the bounds of proper cross-examination. He incorporates by reference his argument from point of error eight, and states that there is nothing in the rules of evidence or case law that would render this testimony admissible. He asserts that the criminal record of a third party is irrelevant and prejudicial. He contends that harm has been established

because, in closing argument, the prosecutor described appellant's character witnesses as "a parade of thugs."

After defense counsel questioned Chineyere, the prosecutor approached the bench and stated that, on cross-examination, he intended to question Chineyere about her mother's criminal history. He stated that this line of questioning was admissible to correct a false impression left by her testimony during direct examination. Specifically, Chineyere had testified on direct examination that appellant became his siblings' primary caregiver when he was still in middle school. She explained that their mother was not at home to take care of them because she was always at work. In fact, however, their mother was often not at home because she was in jail. Defense counsel objected to the prosecutor's proposed line of questioning, arguing that the defense had not left a false impression simply by questioning Chineyere about the long hours that her mother worked. The trial court overruled the objection, explaining that the impression had been left with the jury that their mother's absence from the home was the result of her working two jobs, and the State could offer evidence to correct this impression.

The prosecutor then questioned Chineyere: "In fact, your mother, Julia Jordan, was out of the house because – why don't you tell me how many times she's been arrested since you and Demontrell lived in the house with her?" Chineyere responded, "How would I know that?" The prosecutor then began questioning Chineyere about specific arrests: "Well, because isn't it true that in 1994 – how old would you have been then?" Chineyere answered

that she would have been four years old. The prosecutor then asked, "[Your mother] was arrested for possession of a controlled substance, was she not?" Chineyere responded that she did not know and that she did not ask. The prosecutor then asked about another arrest: "Okay, January 17th of 1996 she was arrested on two cases of theft, was she not?" Chineyere responded that she did not know, and she would have been six years old at that time. The prosecutor then asked Chineyere what her mother had been arrested for in 2001, and Chineyere again responded that she did not know.

After similar questions and answers about numerous additional arrest dates, Chineyere stated that she did not know about her mother's arrests and that she did not care to know such things about her mother. The prosecutor continued, "So how many times has she been in jail when you were growing up?" Chineyere again stated that she did not know, and she added that she did not remember her mother being in jail. She explained, "[I]f my mom was arrested, they not going to tell us, they probably tell us something else. So I don't remember my mom being arrested."

An appellate court will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Winegarner v. State,* 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The general rule is that a party is not entitled to impeach a witness on a collateral matter. *Ramirez,* 802 S.W.2d at 675. However, when a witness leaves a false impression concerning a matter relating to his or her credibility, the opposing party is allowed to correct that false impression. *Id.* at 676. Similarly, a party may open the door to otherwise inadmissible

evidence to rebut or correct a false impression for which he was responsible. *Whitaker v. State,* 286 S.W.3d 355, 364 n.8 (Tex. Crim. App. 2009) (citing *Renteria v. State,* 206 S.W.3d 689, 697 (Tex. Crim. App. 2006)).

Chineyere testified that, from the time appellant was in middle school, he was his siblings' primary caregiver because their mother was never at home because she was always at work. The trial court did not abuse its discretion by determining that this testimony left a false impression concerning a matter relating to Chineyere's credibility as a character witness. This testimony was relevant to Chineyere's credibility in at least two ways. First, if Chineyere did not know or remember that their mother was often in jail when they were growing up, then this fact was relevant to the jury's assessment of Chineyere's ability to accurately observe and recall details about her home life and her immediate family members, including appellant. Second, if Chineyere knew that their mother was often in jail when they were growing up, but she chose to omit this information from her explanation of why their mother was never home, then this fact was relevant to the jury's assessment of her candor.

In addition, the trial court did not abuse its discretion by determining under Rule 403 that the probative value of questioning Chineyere concerning her mother's criminal history was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. As mentioned above, this questioning arguably corrected a false impression and had some limited probative value concerning Chineyere's reliability and credibility as a character witness. The probative value of the substantive information concerning their mother's arrest

record was minimal, but the risk of unfair prejudice to appellant was also minimal because the arrests were not appellant's, and although they were numerous, they were for non-violent offenses. Furthermore, the jury became aware of the mother's criminal history through unobjected-to testimony by another witness, and, therefore, the prejudicial effect of the evidence from Chineyere's testimony was mitigated. We conclude the trial court did not abuse its discretion by overruling the appellant's objection that the testimony was overly prejudicial. Point of error nine is overruled.

In point of error ten, appellant asserts that the trial court erred in overruling his objection to the prosecutor's improper cross-examination of Reverend Allen Dotson concerning his knowledge of appellant's mother's criminal history. Appellant asserts that questioning a character witness about the criminal record of a third party is "totally irrelevant and prejudicial to the [a]ppellant." It appears from appellant's argument that he also means to complain about the fact that, during this examination, the prosecutor misrepresented appellant's mother's criminal record by describing her as a convicted felon. Appellant incorporates by reference his argument from point of error eight, adding that there is nothing in the rules of evidence or case law that would render this testimony admissible. He asserts that he was harmed because the prosecutor emphasized this sort of improper testimony when, in closing argument, she described appellant's character witnesses as "a parade of thugs."

The record reflects that the prosecutor asked Dotson, "[Appellant's mother] is a convicted felon, is she not?" He responded that she was. Defense counsel then asked to

approach the bench and objected that this questioning constituted collateral impeachment of a witness who was not on the stand, and that appellant's mother had no final felony convictions that were available for impeachment. In response, the prosecutor asserted that he was not impeaching appellant's mother but rather was testing Dotson's knowledge of appellant's family. The prosecutor reviewed his records and acknowledged that appellant's mother did not have a final felony conviction but instead had received deferred-adjudication probation for a felony offense. He stated that he would correct this information. After the bench conference, the prosecutor asked Dotson whether appellant's mother "was actually on a third degree felony deferred adjudication probation" for a term of ten years. Dotson acknowledged that she was.

Appellant's complaints on appeal do not comport with his objections at trial. *See* TEX. R. APP. P. 33.1(a). Moreover, any error in this line of questioning was cured when similar information was elicited without objection during the examination of other witnesses. *See Coble,* 330 S.W.3d at 282 & n.82. Defense counsel did not object when the prosecutor asked Ceola during the guilt phase, "Do you know that Julia Jordan is – has a felony conviction for drugs?" Ceola responded, "I don't know the whole story, but . . . when they were doing the whole thing at the hospital about the custody thing, [] they had mentioned it." Also, as previously discussed in point of error nine, during the punishment phase, the prosecutor questioned appellant's sister, Chineyere, about their mother's arrests. Although defense counsel objected generally to this line of questioning, the objection was properly overruled.

Counsel did not lodge a separate objection when the prosecutor asked Chineyere, "When did [your mother] go on the ten years deferred adjudication probation for a felony?" Thus, the same information about appellant's mother was elicited without objection during the examination of other witnesses. Point of error ten is overruled.

In point of error eleven, appellant complains that the trial court erroneously overruled his objections to the prosecutor's improper cross-examination of Terrance Green. Specifically, the trial court allowed the prosecutor to question Terrance about a fight that he had been in, when this fight did not result in a conviction and appellant was not part of it. Appellant contends that this extraneous bad act had nothing to do with appellant's character, and its probative value was substantially outweighed by its prejudicial effect under Rule 403. *See* TEX. R. EVID. 403. He incorporates his arguments from points of error seven, eight, and nine, and urges that the "net effect of this improper cross examination of [a]ppellant's character witnesses [was] in effect [to] demonize them and [undermine] their credibility to such an extent that harm has been shown."

The record reflects that the same questions and answers had already come in without objection before the complained-of examination, and so any error in overruling appellant's objection was cured. *See Coble,* 330 S.W.3d at 282 & n.82. Terrance had already acknowledged that he had gotten into a fight at the State Fair that resulted in his removal from the grounds by the time defense counsel objected to the prosecutor's continued questioning about this matter. Because the same testimony had already come in, the

admission of this testimony will not result in reversal. Point of error eleven is overruled.

## Future Dangerousness

In point of error twelve, appellant contends that the evidence is insufficient to support the jury's affirmative answer to the future-dangerousness special issue. He asserts that the evidence adduced at trial indicated that he was twenty years old and the product of a good upbringing. He played football and received a football scholarship to Arkansas Tech, where he attended college for a little over a year before he moved back to Tyler. His character witnesses all described him as a gentle, loving, and dedicated family member. Appellant's future-dangerousness expert testified that, of the factors that could increase an offender's risk for future violence, youth was appellant's only risk factor. Therefore, argues appellant, "[t]he evidence taken as a whole is legally insufficient for a rational jury to make the determination that the appellant would be a future danger beyond a reasonable doubt."

When reviewing the sufficiency of the evidence supporting the jury's future-dangerousness determination, we view the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010); *see also Wardrip v. State,* 56 S.W.3d 588, 593 (Tex. Crim. App. 2001). We do not weigh the evidence of future dangerousness against countervailing evidence. *See Brooks v. State,* 323 S.W.3d

893, 894 (Tex. Crim. App. 2010) ("a reviewing court is required to defer to a jury's credibility and weight determinations"); *see also McGinn v. State,* 961 S.W.2d 161, 168-69 (Tex. Crim. App. 1998) (once the rationality of the future-dangerousness prediction is established, it is impossible to determine whether the prediction is nevertheless wrong or unjust because of countervailing evidence).

In determining the special issues, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. Art. 37.071, § 2(d)(1); *see also Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). The jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Wardrip,* 56 S.W.3d at 594 & n.7. The circumstances of an offense, if "severe enough," may alone sustain an affirmative finding as to a defendant's future dangerousness. *Rosales v. State,* 841 S.W.2d 368, 381 (Tex. Crim. App. 1992).

In this case, the circumstances of the offense were severe. The jury had before it the medical evidence of Kelynn's numerous and extensive injuries. There was expert testimony that, after two-year-old Kelynn was fatally injured, he would not have died immediately, and his distress would have been obvious to his caregivers. Yet appellant failed to seek help for Kelynn. Instead, he spoke with his cousin, Gardner, on the phone and told him that he had left Kelynn alone at the pool. The evidence recovered from the apartment included Kelynn's blood-stained shirt, "wet wipes" stained with blood and fecal matter, a section of the living-room carpet stained with Kelynn's blood, and a towel with multiple blood stains. Kelynn's

underwear and shorts contained blood and fecal matter. The jury could reasonably infer from this evidence that, after appellant fatally injured Kelynn, he attempted to set the stage for the story he had concocted. Appellant called Ceola and told her to come home, but did not call 9-1-1. Additionally, appellant gave two separate false statements to the police about the circumstances in which Kelynn was fatally injured.

Further, the jury had before it evidence of appellant's prior violent conduct. There was evidence that appellant had physically injured Kelynn on previous occasions, including breaking his rib by throwing him into a wall and spanking him so hard that red welts rose on his skin, and that Kelynn was afraid of appellant. Although Ceola denied that appellant had physically abused her, her downstairs neighbors testified that they heard loud noises that sounded like domestic disturbances coming from her apartment several nights a week. The noises included banging, crashing, children crying, and the sound of someone being hit and thrown around while a woman screamed and yelled for it to stop. On one occasion, they called 9-1-1 and reported hearing an adult man, an adult woman, and children yelling and crying. They reported that they heard sounds of things slamming and banging and a woman screaming, "You've broken my ear drum, it's bleeding." The neighbors called the police that night because the sounds were so bad that they were afraid that the man was going to kill the woman. When the police arrived, appellant was uncooperative and refused to identify himself. Ceola recalled that episode when she testified. She denied that appellant had physically assaulted her, but acknowledged that appellant had locked her out of their

bedroom, keeping their infant, Ty, in the room with him because he was angry that Kelynn wanted to stay at the apartment with her instead of going to the store with appellant. She admitted that he had been throwing things around and slamming doors and that she had asked appellant's mother to come to their apartment to help her.

In addition to evidence of appellant's prior violent conduct toward Kelynn and Ceola, the jury had before it evidence that appellant had committed violent assaults against others with little or no provocation. In high school, appellant once confronted and fought with another student after his cousin told him that the student had said something rude to her. Appellant, who was 6'4" and 240 pounds, would also join in with others to attack a single, smaller victim. For example, the year after he graduated from high school, appellant, Gardner, Terrance, and another friend assaulted a seventeen-year-old student at a local high-school dance. The victim, Deandre Oliver, testified that he and Terrance had been "dance-battling" when Terrance pushed him. Appellant then punched him in the face, causing him to fall down. Then, Gardner hit him with a chair. Deandre testified that he was kicked several times as he lay on the ground. He did not know why appellant punched him because the two of them had never had a problem.

In another incident that occurred about two months before the present offense, appellant and Joshua accompanied appellant's sister, Chineyere, to an apartment complex where Dramon Green, the father of her child, lived. Appellant drove them there in his mother's van at 2:30 a.m., ostensibly to pick up some clothes and toys for Chineyere's baby.

When they arrived at the apartment complex, however, they saw that Dramon and his other girlfriend, Chelsea Chimney, were sitting in Chelsea's parked car with the windows rolled down. Appellant parked his van directly behind Chelsea's car so that it was blocked in. Chineyere then walked over to the car, opened the passenger door, and told Dramon to get out. He started to get out, and Chineyere appeared to be walking back to the van, but then Chelsea heard appellant say, "Go get that bitch." Chineyere then turned around and approached the driver's side door of Chelsea's car, yelling at Chelsea to get out. As she continued yelling, Chineyere reached in through the open window and poked Chelsea on the head. Chelsea told Chineyere that she was not going to fight her and asked her to get away from the car and move the van so she could leave, but Chineyere continued yelling and poking at her. Chelsea put her car into reverse, but Chineyere would not get away from her and appellant would not move the van.

Eventually, Chelsea put her car back into park and got out to fight with Chineyere. After a couple of minutes of fighting, Chelsea knocked Chineyere down, got on top of her, and started hitting her. Appellant then jumped in and punched Chelsea in the face, causing her to fall down. Appellant repeatedly kicked and kneed Chelsea as she lay on the concrete. She managed to get away from him and ran to the sidewalk where there were onlookers, but no one came forward to help her. Chineyere followed Chelsea and continued fighting with her until the police arrived. The responding officer who spoke with appellant after the fight testified that appellant explained that he had punched and kicked Chelsea because he "wasn't

going to let his sister get whooped."

Finally, there was evidence that appellant had disciplinary problems in jail following his arrest, including an incident in which he repeatedly disobeyed a guard and then grabbed for his hand, so that another guard had to intervene to resolve the situation. In view of this evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *See Lucio v. State*, 351 S.W.3d 878, 885-86 (Tex. Crim. App. 2011). Point of error twelve is overruled.

## Challenges to Death-Penalty Scheme

Appellant's points of error thirteen through twenty-eight challenge the death-penalty scheme in Texas. In points of error thirteen and fourteen, appellant asserts that Article 37.071 violates the Eighth Amendment because it allows the jury too much discretion in determining who should live and who should die and lacks minimal standards and guidance for avoiding the arbitrary and capricious imposition of the death penalty. In addition, the mitigation special issue sends mixed signals to the jury, such that any verdict with respect to mitigation is intolerable and unreliable. We have rejected similar arguments before, and appellant has not persuaded us to revisit them here. *See Coble,* 330 S.W.3d at 297; *Feldman v. State,* 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Ladd v. State,* 3 S.W.3d 547, 573 (Tex. Crim. App. 1999); *Raby v. State,* 970 S.W.2d 1, 9 (Tex. Crim. App. 1998). Points of error thirteen and fourteen are overruled.

In point of error fifteen, appellant asserts that Article 37.071 violates due process by implicitly placing the burden of proving mitigation onto appellant rather than requiring the jury to find the mitigation issue against appellant under the "beyond a reasonable doubt" standard. We have rejected similar arguments before. *See Blue v. State,* 125 S.W.3d 491, 501 (Tex. Crim. App. 2003); *Raby,* 970 S.W.2d at 9. Point of error fifteen is overruled.

In point of error sixteen, appellant asserts that the trial court erred by overruling his motion to hold Article 37.071, sections 2(e) and 2(f), unconstitutional under the Texas Constitution's due-course-of-law provision because the statute shifts the burden of proof to appellant. Appellant is obligated to point out to this Court where in the record he preserved error. *See* TEX. R. APP. P. 33.1(a), 38.1(h); *see also Davis v. State,* 313 S.W.3d 317, 352-53 (Tex. Crim. App. 2010). However, appellant does not indicate where in the record he filed such a motion and obtained a ruling on it. Therefore, he has failed to demonstrate that he preserved error. Point of error sixteen is overruled.

In point of error seventeen, appellant asserts that the death-penalty scheme violates due process by failing to place the burden on the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt in violation of *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and its progeny. We have repeatedly rejected similar arguments. *See Coble,* 330 S.W.3d at 296; *Blue,* 125 S.W.3d at 501; *Raby,* 970 S.W.2d at 9. Point of error seventeen is overruled.

In point of error eighteen, appellant asserts that the death-penalty scheme violates due

process of law and his right to be free from cruel and unusual punishment by requiring at least ten "no" votes for the jury to return a negative answer to the future-dangerousness special issue or a positive answer to the mitigation special issue. He argues that this requirement constitutes an impermissible built-in dynamite charge, injects arbitrariness into sentencing, and violates *Mills v. Maryland,* 486 U.S. 367 (1988), because of the risk that jurors will believe that they have to find sufficient mitigating factors unanimously before they can answer the mitigation special issue affirmatively. We have rejected these arguments in previous cases. *See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). Point of error eighteen is overruled.

In point of error nineteen, appellant asserts that the death-penalty scheme violates his rights to be free from cruel and unusual punishment, to an impartial jury, and to due process of law because of vague, undefined terms in the punishment-phase jury instructions. Specifically, appellant complains that the trial court did not define "probability," "continuing threat to society," and "criminal acts of violence," which are terms that are so vague and indefinite that their inclusion violated his fundamental rights, such that there is no rational process for imposing the death penalty and no rational review on appeal. We have repeatedly rejected these claims. *See Coble,* 330 S.W.3d at 297. Point of error nineteen is overruled.

In points of error twenty and twenty-one, appellant asserts that the death-penalty scheme violates his right to be free from cruel and unusual punishment, due process of law,

and the Texas Constitution's due course of law provision because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.[4] He relies primarily on Justice Blackmun's dissenting opinion in *Callins v. Collins,* 510 U.S. 1141 (1994). This Court and the United States Supreme Court have rejected this claim. *See Turner v. State,* 87 S.W.3d 111, 118 (Tex. Crim. App. 2002) (citing *Callins,* 510 U.S. at 1141-42 (Scalia, J., concurring)). The death-penalty scheme narrows the class of death-eligible defendants and provides the jury with a vehicle to fully consider mitigating evidence. *See Saldano v. State,* 232 S.W.3d 77, 107 (Tex. Crim. App. 2007); *see also McFarland v. State,* 928 S.W.2d 482, 520 (Tex. Crim. App. 1996) (rejecting argument that death-penalty scheme is *per se* unconstitutional because the requirement that the jury consider mitigating evidence contradicts the requirement of "structured discretion"). Points of error twenty and twenty-one are overruled.

In point of error twenty-two, appellant asserts that the trial court erred in overruling his motion to hold Article 37.071, sections 2(c) and 2(f), unconstitutional for failing to require the jury to consider the issue of mitigation in violation of the Eighth Amendment. He argues that capital-murder statutes that have been held constitutional all require that the jury be instructed that it must consider all mitigating evidence. Appellant does not indicate

---

[4] Appellant makes no distinction between his rights under the federal and Texas constitutions. Therefore, we will treat them as being the same in this context. *See Luquis v. State,* 72 S.W.3d 355, 364 (Tex. Crim. App. 2002).

where in the record he filed and obtained a ruling on such a motion. *See* TEX. R. APP. P.

33.1(a) & 38.1(h); *see also Davis,* 313 S.W.3d at 352-53.  Therefore, appellant has failed to

demonstrate that he preserved error.  Moreover, the record shows that the jury in this case

was instructed to fully consider and give effect to all evidence, including mitigating evidence.

*See Heiselbetz v. State,* 906 S.W.2d 500, 508 (Tex. Crim. App. 1995) (citing *Penry v.*

*Lynaugh,* 492 U.S. 302, 323 (1989)); *see also Johnson v. Texas,* 509 U.S. 350, 367 (1993)

(appellate courts evaluate jury instructions with a commonsense understanding in the light

of all that has taken place at the trial).  Point of error twenty-two is overruled.

In point of error twenty-three, appellant asserts that the *"Penry* issue"[5] in Article

37.071 is unconstitutional because it fails to place the burden of proof on the State with

respect to aggravating evidence.  He argues that the mitigation special issue is a conduit for

aggravating as well as mitigating factors, and that the mitigation issue invites jurors to weigh

aggravating against mitigating factors.  He claims that the jury instruction is silent regarding

the burden of proof as to aggravating factors, which implies that the defense has the burden

to disprove aggravating factors and to prove mitigating factors, rendering the instruction

unconstitutional under the Eighth and Fourteenth Amendments.  Appellant adds, in point of

error twenty-four, that the *"Penry* issue" permits the type of open-ended discretion that was

condemned in *Furman v. Georgia.*  408 U.S. 238 (1972). We have rejected these claims.  *See*

*Coble,* 330 S.W.3d at 297; *Ladd,* 3 S.W.3d at 573; *Raby,* 970 S.W.2d at 9; *see also Williams,*

---

[5]    We infer that appellant uses the term "*Penry* issue" to refer to the mitigation instructions set forth in Article 37.071, sections 2(e) and 2(f).

301 S.W.3d at 694. Points of error twenty-three and twenty-four are overruled.

In point of error twenty-five, appellant asserts that the capital-sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review. He argues that the Court is required by Article 44.251 and the Constitution to review on appeal the sufficiency of the evidence supporting a negative answer to the mitigation issue. We have rejected similar claims, and appellant has not persuaded us to revisit them. *See Blue,* 125 S.W.3d at 504; *Cockrell v. State,* 933 S.W.2d 73, 92 (Tex. Crim. App. 1996). Point of error twenty-five is overruled.

In point of error twenty-six, appellant asserts that the trial court erred in overruling his second motion to set aside the indictment based on constitutional defects of the death-penalty scheme. He does not indicate where in the record he filed and obtained a ruling on such a motion. *See* TEX. R. APP. P. 33.1(a), 38.1(h); *see also Davis,* 313 S.W.3d at 352-53. Point of error twenty-six is overruled.

In points of error twenty-seven and twenty-eight, appellant asserts that the cumulative effect of the constitutional violations committed during his trial proceedings denied him due process under the United States Constitution and due course of law under the Texas Constitution. Because we have rejected appellant's individually asserted constitutional violations, there is no error to cumulate. *See Chamberlain v. State,* 998 S.W.2d 230, 238

(Tex. Crim. App. 1999); *see also Wyatt v. State,* 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).[6]

Points of error twenty-seven and twenty-eight are overruled.

We affirm the judgment of the trial court.

Delivered: May 23, 2012

Do Not Publish

---

[6] As discussed in point of error eight, above, any error with regard to the cross-examination of appellant's character witnesses was non-constitutional error that did not affect his substantial rights to a fair sentencing trial.